*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KIVA O., | ) | |
| | ) | Supreme Court No. S-16605 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-15-00161 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 7215 – January 5, 2018 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

Appearances: Josie W. Garton, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Ruth Botstein, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.
STOWERS, Chief Justice, concurring.

## I.     INTRODUCTION

An Indian child in the custody of the Office of Children's Services (OCS) was diagnosed with post-traumatic stress disorder and depression.     The child's

psychiatrist recommended treating him with an antidepressant, with the addition of a mood stabilizer if it later became necessary. When the mother rejected the recommendation, OCS asked the superior court for authority to consent to the medications over the mother's objection. The court granted OCS's request.

The mother appeals, arguing that the superior court failed to apply the correct standard for determining whether her fundamental constitutional rights as a parent could be overridden. We agree with her in part. We hold that the constitutional framework laid out in *Myers v. Alaska Psychiatric Institute*[1] applies to a court's decision whether to authorize medication of a child in OCS custody over the parent's objection. We conclude that the superior court's findings in this case regarding the antidepressant satisfy the *Myers* standard but that its findings regarding the optional mood stabilizer do not. We therefore affirm in part and reverse in part the superior court's order authorizing OCS to consent to the recommended medications.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Alec,[2] born in October 2007 to Kiva O., is an Indian child under the Indian Child Welfare Act (ICWA).[3] He and his sister Maia are both in OCS custody. Alec was in a therapeutic foster home during the proceedings relevant to this appeal.

Alec had behavioral problems, including being "irritable[] [and] disruptive, having conflicts with peers, struggling academically, and generally [being] despondent and tearful." His therapist referred him to a psychiatrist, Dr. Richard Brown. "Dr.

---

[1]     138 P.3d 238 (Alaska 2006).

[2]     We use pseudonyms to protect the parties' privacy.

[3]     25 U.S.C. § 1903(4) (2012).

Brown observed [Alec] to be tearful, frustrated, angry, and deeply disheartened" and reported that Alec "consistently expressed that he misses his mother, that he would like to see his mother, and that he gets frustrated when that [visitation] doesn't happen." Dr. Brown diagnosed Alec with post-traumatic stress disorder and adjustment disorder, revising the latter diagnosis later to "[m]ajor [d]epressive [d]isorder due to the length and severity of [Alec's] symptoms."

### 1. Medication recommendation

Dr. Brown tried to treat Alec's behavioral problems without medication. He "first concentrated on giving [Alec] time to establish a consistent therapeutic relationship, develop social strategies, and work on behavioral changes." But when Alec's symptoms persisted, Dr. Brown recommended treating him with Lexapro, an antidepressant. "Dr. Brown's professional expectation [was that] Lexapro would allow [Alec] to engage in his other therapeutic interventions in a more effective manner." He testified that the medication would probably decrease Alec's irritability and impulsiveness; he believed that if Alec could be "establish[ed] . . . in a calmer mental status," he could learn coping strategies, "make use of those, and . . . actually participate actively in the treatment process" through ongoing therapy. Dr. Brown intended "to treat [Alec] without the need of using an inpatient hospitalization if possible."

Lexapro's potential side effects were addressed in Dr. Brown's courtroom testimony. Like other antidepressants of the same type, Lexapro may cause mild tiredness and increased excitation; it may in rare instances decrease libido; and "a small percentage of people (including younger people) experience increased suicidal thoughts within the first month of treatment." Lexapro has a "black-box" warning about its use

with children under the age of 12 based on the associated risk of suicide,[4] but Dr. Brown testified that the warning did not necessarily contraindicate the drug's use in Alec's case. He emphasized that it is more dangerous not to treat a depressed patient at all: "[W]hen a person is depressed and they're not treated, they . . . have a higher propensity to either hurt themselves, kill themselves, or put themselves in [a] position [where] they could be hurt."

The "black-box" warning notwithstanding, Dr. Brown testified that prescribing the drug for young people "is the national standard of practice amongst psychiatrists." He chose Lexapro for Alec because he hoped Alec would respond to it more quickly — the typical response time is within four to six weeks — than he would to an FDA-approved alternative like Prozac, which typically takes six to eight weeks for a response. He was also concerned that Prozac can cause increased irritability, which would be "anti-therapeutic" given Alec's symptoms and treatment goals.

Dr. Brown expected Alec to be on Lexapro for nine months to a year. He testified that if Lexapro did not prove effective at a five milligram dosage "within a reasonable period of time," he would try increasing it to the typical starting dosage of ten milligrams,[5] switching to a different antidepressant, or adding a mood stabilizer (an "atypical antipsychotic") like Risperdal. He testified that the side effects of these mood stabilizers can be serious.

---

[4] Dr. Brown explained that a black-box warning is used "when the [federal Food and Drug Administration] has some concerns about some specific side effect" and alerts physicians "to make sure we inform people" of the risk.

[5] Dr. Brown testified that he started Alec at five milligrams rather than the typical starting dosage of ten milligrams because Alec was "under the age that Lexapro is typically recommended."

## 2. Communication with Kiva

OCS contacted Kiva to discuss Dr. Brown's recommendations for her son. Kiva looked up Lexapro on the internet and found warnings against prescribing it for children under 12. She "expressed immediate concerns about the possible side effects of Lexapro," especially given Alec's age.

OCS asserts that it attempted to set up meetings with Kiva to provide her with more information, including a meeting with OCS's psychiatric nurse. Kiva claims she attempted to call Dr. Brown's office directly for more information but her calls were never returned; Dr. Brown's nurse testified that Kiva never called. It is undisputed that when the OCS case manager tried to visit Kiva at home, Kiva refused to discuss the issue without her lawyer and a tribal representative present. The superior court found that OCS attempted to set up three other informational meetings with Kiva but she "failed to attend."

## B. Proceedings

When it became clear that Kiva would not consent to the administration of Lexapro, OCS asked the superior court "for authority to consent to psychiatric medication for [Alec], as prescribed by treating physicians." OCS attached an affidavit from its psychiatric nurse, who gave her professional opinion that "[d]ue to the lack of engagement by mom in this child's case, and the escalation of the child's behaviors[,] . . . OCS should be granted the authority to consent to medications for this child."

Alec's tribe and his guardian ad litem both supported OCS's request. Kiva opposed it, arguing that the request was overbroad because it was not limited to a specific medication; she also argued that OCS had to support its request by reference to

a test laid out in *Myers*[6] for the administration of psychotropic drugs to adults who have been involuntarily committed.

The superior court held an evidentiary hearing over several days in December 2016 and January 2017. Dr. Brown testified about his diagnosis and his recommendation for Lexapro and possibly, in time, a mood stabilizer like Risperdal. The court also heard testimony from Dr. Brown's nurse, the OCS caseworker, and Kiva.

On January 13, 2017, the superior court issued a single-page order granting OCS authority to consent to the administration of "Lexapro and an accompanying mood stabilizer (including Risperdal), as necessary, as determined and prescribed by [Dr. Brown]."[7] Kiva filed a motion to stay enforcement the same day, asserting that Alec would "suffer irreparable harm from the premature administration of psychiatric medication" and that "[a] stay of the [order] is necessary to avoid the harm arising from having [Alec] medicated and then abruptly un-medicated if [Kiva] prevails in her appeal." She also asked that the superior court make the specific findings of fact she argued were required by *Myers*. The superior court denied her request for a stay, reasoning that "[Alec] faces greater harm from not being medicated than he does from the potential side effects of medication." But the court did issue the requested findings of fact.

In its findings, the court summarized Dr. Brown's testimony about his recommendations and OCS's attempts to contact Kiva. The court noted Kiva's testimony that she "might be willing to consent at some indefinite point in the future

---

[6] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 252 (Alaska 2006).

[7] OCS and Kiva agree that the order should be narrowly construed to authorize only the use of Risperdal, not other atypical antipsychotics that are unnamed.

once she feels all options have been exhausted and it's truly necessary." But the court found that Kiva "placed a great degree of weight on the potential risks of medication, while displaying a poor understanding of [Alec's] diagnoses and the potential benefits of the medication." The court noted that Kiva also "refused to accept Dr. Brown's diagnosis of Major Depressive Disorder in the absence of an opportunity for her to independently observe [Alec]." Although noting that Kiva "spoke compellingly about her understanding of [Alec's] ongoing pain and struggles," the court could not "credit [her] perspective in light of the collective scientific and medical fields of psychology and psychiatry and in light of Dr. Brown's testimony."

The court found that "Dr. Brown's recommendation that [Alec] begin treatment with Lexapro at 5 mg, to increase to 10 mg and/or be accompanied with treatment of an atypical antipsychotic, as necessary, is narrowly tailored to treat [Alec's] specific diagnoses and to allow [him] to engage more functionally in his holistic treatment regimen." The court found that Dr. Brown's recommendation was both "well-considered and the least restrictive means necessary to alleviate [Alec's] psychiatric symptoms in an out-patient treatment setting." The court found that Kiva's refusal to consent was contrary to Alec's welfare and that OCS "presented clear and convincing evidence that conformity with Dr. Brown's psychiatric medication recommendation [was] in [Alec's] best interests." In a footnote, the court rejected Kiva's assertion that *Myers* applied, but it explained that it "provide[d] the extended *Findings of Fact* above [reflecting the factors addressed in *Myers*] to facilitate rapid resolution of any appellate point by the appellate court without further trial proceedings."

Kiva filed a motion for reconsideration the same day. She cited *Huffman v. State* for the proposition that her "right to make decisions about medical treatments

for" Alec "is a fundamental liberty and privacy right in Alaska."[8] The court denied reconsideration, explaining that OCS had "provided a compelling reason for the requested treatment that sufficiently overrides [Kiva's] right to consent to medication per the state and federal constitution[s]."

Kiva appeals.

## III. STANDARDS OF REVIEW

We review questions of statutory interpretation and constitutional law de novo, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[9] "We review a trial court's factual findings for clear error. Factual findings are clearly erroneous if a review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[10]

"[W]hether there is a less intrusive alternative is a mixed question of fact and law."[11] Whether a particular medical treatment is in a patient's best interests is also a mixed question of fact and law.[12]

## IV. DISCUSSION

Kiva's primary argument is that the superior court erred in granting OCS's request for the authority to medicate Alec over her objection because its findings failed

---

[8]     204 P.3d 339, 346 (Alaska 2009).

[9]     *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178-79 (Alaska 2009) (citing *Vezey v. Green*, 171 P.3d 1125, 1129 (Alaska 2007)).

[10]     *Id.* at 178 (footnote omitted) (citing *Vezey*, 171 P.3d at 1128).

[11]     *Id.* at 185.

[12]     *In re Jacob S.*, 384 P.3d 758, 763-64, 772 (Alaska 2016).

to satisfy the standard developed in *Myers v. Alaska Psyhicatric Institute*,[13] a case decided in the different context of an institution's request to medicate an adult patient who had been involuntarily committed. We agree with Kiva that the *Myers* standard must apply to protect her fundamental constitutional rights as a parent to consent to her child's medical treatment. We conclude that the superior court's findings about Lexapro satisfied that standard, but that the court should have waited to decide whether to authorize the administration of Risperdal until the need for the drug was less hypothetical and the court could better weigh the available alternatives.

A.      **The *Myers* Constitutional Standard Applies To OCS's Request To Medicate A Child Over Parental Objection.**

Kiva argues that her right to consent to medical treatment on behalf of Alec is a "fundamental liberty and privacy right" deserving a very high level of protection. "The analysis required to resolve an individual rights claim depends upon the type of right being asserted."[14] We have explained that we

> determine the boundaries of individual rights guaranteed under the Alaska Constitution by balancing the importance of the right at issue against the state's interest in imposing the disputed limitation. When a law places substantial burdens on the exercise of a fundamental right, we require the state to "articulate a compelling [state] interest" and to demonstrate "the absence of a less restrictive means to advance [that] interest." But when the law "interferes with an individual's freedom in an area that is not characterized as fundamental," we require the state to "show a legitimate interest and a close

---

[13]     138 P.3d 238 (Alaska 2006).

[14]     *Huffman v. State*, 204 P.3d 339, 345 (Alaska 2009).

and substantial relationship between its interest and its chosen means of advancing that interest."[15]

The first question under this test is whether Kiva had a fundamental right that was substantially burdened by OCS's request for authority to treat her child over her objection.

### 1. Medicating Alec over Kiva's objection substantially burdens her fundamental constitutional rights.

Alaska case law recognizes the fundamental right to consent to medical treatment for oneself[16] and one's children.[17] We addressed the rights relevant to an individual's own medical treatment in *Myers*.[18] Myers, a patient with a long history of mental illness, had been involuntarily committed.[19] She "refused to discuss treatment options with institute doctors," and the hospital sought authority to medicate her without her consent.[20] The superior court granted that authority, and Myers appealed.[21]

Vacating the treatment order, we held that "the right to refuse to take psychotropic drugs is fundamental" because of "the nature and potentially devastating impact of psychotropic medications — as well as the broad scope of the Alaska

---

[15]     *Id.* at 345-46 (alterations in original) (quoting *Myers*, 138 P.3d at 245-46).

[16]     *See Myers*, 138 P.3d at 248 (holding that an individual has a fundamental liberty and privacy right in his or her own medical treatment); *see also Bigley*, 208 P.3d at 180.

[17]     *See Huffman*, 204 P.3d at 346.

[18]     138 P.3d at 248.

[19]     *Id.* at 239.

[20]     *Id.*

[21]     *Id.* at 240.

Constitution's liberty and privacy guarantees."[22]  Our conclusion was strengthened by "the truly intrusive nature of psychotropic drugs," which "are literally intended to alter the mind."[23]  Because "a mental patient's right to refuse psychotropic medication" is a fundamental right, we held that, in the absence of emergency, "the state may override [that right] only when necessary to advance a compelling state interest and only if no less intrusive alternative exists."[24]

We later extended *Myers*'s reasoning — about a patient's own decision-making — to parents' medical decisions on behalf of their children.[25]  In *Huffman* we reviewed a school district's decision that the Huffmans' sons could attend school only if they received a particular type of skin test for tuberculosis or qualified for a medical exemption.[26]  The Huffmans objected to the test because of its intrusiveness; it required the injection of "a solution containing purified protein into the skin on the forearm" in order to detect latent or active tuberculosis infection.[27]

We held that "the right to make decisions about medical treatments for oneself or one's children is a fundamental liberty and privacy right in Alaska" because "controlling one's medical treatment falls into the same category of personal physical autonomy" that we already held was entitled to constitutional protection in other

---

[22]     *Id.* at 248 (footnote omitted).

[23]     *Id.* at 242.

[24]     *Id.* at 248.

[25]     *Huffman v. State*, 204 P.3d 339, 346 (Alaska 2009).

[26]     *Id.* at 341.

[27]     *Id.*

contexts. [28] We explained that compelling students to submit to the skin test over their parents' objection, without considering less intrusive alternatives, unconstitutionally infringed on the parents' rights.[29]

OCS argues that in this case the parent's fundamental rights are of a different character because of Alec's status as a child in need of aid in OCS custody. OCS points out that by statute it bears "the responsibility of physical care and control of" a child in its custody, including "the duty of providing the child with food, shelter, education, and medical care."[30] At the same time, OCS acknowledges that "[t]hese obligations are subject to any residual parental rights and responsibilities,"[31] statutorily defined to "include . . . the right and responsibility of . . . consent to major medical treatment"; and "major medical treatment" is defined to include "the administration of medication used to treat a mental health disorder."[32] OCS contends, however, that the parent's "residual right" may "be overruled when the parent's preference is contrary to the child's best interests," citing *K.T.E. v. State*[33] as providing the appropriate best interests standard for deciding the issue.

---

[28]     *Id.* at 346 (first citing *Breese v. Smith*, 501 P.2d 159, 169-70 (Alaska 1972) (addressing a student's right to determine his own hairstyle); then citing *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997) (addressing a woman's right to make her own reproductive choices)).

[29]     *Id.* at 347.

[30]     AS 47.10.084(a).

[31]     *Id.*

[32]     AS 47.10.084(c).

[33]     689 P.2d 472, 477-78 (Alaska 1984).

*K.T.E.* addressed "reasonable visitation," which is another of the "residual rights and responsibilities of the parent" specifically reserved to the parent by AS 47.10.084(c). In *K.T.E.*, the mother objected to the Division of Family and Youth Services' discontinuation of her visitation with her daughter, arguing that the Division's action violated this statutory reservation of rights.[34] We concluded, however, that "[t]he phrase 'reasonable visitation' does not imply an absolute right to visitation" and should be read in conjunction with the rest of the statute to allow the Division to deny visitation when visits would not be in the child's best interests.[35] The superior court had found that visitation caused the daughter "extensive emotional harm."[36] Citing the testimony and credibility assessments that supported this finding, we affirmed the superior court's determination that the Division's decision was in the child's best interests.[37]

We decline to read the *K.T.E.* best interests test as controlling here, for several reasons. First, in *K.T.E.* we were asked to decide only the "right to reasonable visitation under section .084(c),"[38] not whether the right acknowledged by statute was a fundamental constitutional right. The only constitutional issue raised on appeal in *K.T.E.* was whether the procedures for denying visitation rights complied with due process; finding the constitutional issue waived because it had not been preserved in the superior court, we nonetheless held that procedures outlined in the opinion as guidelines

---

[34]     *Id.* at 477.

[35]     *Id.*

[36]     *Id.*

[37]     *Id.* at 477-78.

[38]     *Id.* at 477.

for future cases would be "constitutionally adequate."[39]  Second, we noted in *K.T.E.* that "[t]he [statutory] phrase 'reasonable visitation' does not imply an absolute right to visitation";[40] the statutory phrase "consent to major medical treatment" contains no such modifier and explicitly defines major medical treatment as including administration of psychiatric medication.  And third, *K.T.E.* was decided over two decades before our discussions of fundamental rights as they relate to medical decision-making in *Myers* and *Huffman*.

In this case we conclude, as we did in *Huffman*, that because the parent is asserting a fundamental constitutional right in the context of medical treatment for her child, *Myers* provides the appropriate analytical framework.  Our review of AS 47.10.084 convinces us that its express recognition of the parent's residual right "to consent to major medical treatment" does not signal a weakening of the fundamental constitutional right.

We also conclude that Kiva's right is substantially burdened in this case.  OCS's proposed treatment of Alec is significantly more invasive than the tuberculosis skin test at issue in *Huffman*:  as we explained in *Myers*, treatment with psychotropic drugs is "truly intrusive" and "literally intended to alter the mind."[41]

---

[39]    *Id.* at 478 n.14.

[40]    *Id.* at 477.

[41]    *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 242 (Alaska 2006).

### 2. OCS has a compelling interest in Alec's medical care.

We must next determine "whether the State . . . met 'its substantial burden of establishing that the abridgement in question was justified by a compelling governmental interest.' "[42] If so, we must decide whether OCS proved that the proposed treatment was in Alec's best interests and "that 'no less restrictive means could advance' the compelling interest it has articulated."[43]

Kiva does not dispute that OCS has a compelling interest in providing necessary medical care for children in its custody. We concluded in *Myers* that the State's *parens patriae* power "to protect 'the person and property' of an individual who 'lack[s] legal age or capacity' "[44] gave it "a compelling interest in administering psychotropic medication to unwilling mental patients in some situations."[45] We agree that OCS has a similarly compelling interest in this case in providing adequate medical care to Alec.[46] Its *parens patriae* power and its statutory obligations justify its interference in Kiva's reserved parental rights under some circumstances.[47] To determine

---

[42]    *Huffman v. State*, 204 P.3d 339, 346 (Alaska 2009) (quoting *Breese v. Smith*, 501 P.2d 159, 171 (Alaska 1972)).

[43]    *Id.* (quoting *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997)); *see Myers*, 138 P.3d at 249.

[44]    *Myers*, 138 P.3d at 249 (alteration in original) (first quoting *Pub. Def. Agency v. Superior Court*, 534 P.2d 947, 949 n.2 (Alaska 1975); then quoting *Non Sui Juris,* BLACK'S LAW DICTIONARY (8th ed. 2004)).

[45]    *Id.*

[46]    *See id.*

[47]    *See* AS 47.10.084(a) ("This relationship imposes on the department . . . the duty of providing the child with . . . medical care . . . ."); AS 47.10.005(1)(a) ("The
(continued...)

whether those circumstances exist here, we move to the next step of the constitutional inquiry — the best interests test.[48]

### 3. The administration of Lexapro is in Alec's best interests.

#### a. The *Myers* best interests factors

In *Myers*, after concluding that the State had a compelling interest that could justify interference in the patient's fundamental rights, we laid out a "constitutional balancing test" for determining the issue.[49] We explained that "adequate protection of [a patient's liberty and privacy rights] can only be ensured by an independent judicial determination of the patient's best interests considered in light of any available less intrusive treatments."[50] Proving that its proposal is in the patient's best interests is the burden of the State, which must carry its burden with clear and convincing evidence.[51] Discussing the "appropriate criteria to guide courts" in the best interests inquiry, we

---

[47]     (...continued)
provisions of this chapter shall be liberally construed to . . . achieve the end that a child coming within the jurisdiction of the court under this chapter may receive the care, guidance, treatment, and control that will promote the child's welfare and the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests . . . .").

[48]     *See Myers*, 138 P.3d at 249 (explaining that although "the state's *parens patriae* obligation does give it a compelling interest," it "simply raises the difficult question:  does the current statutory scheme use an overly intrusive means to attain the state's interest by failing to require an independent judicial determination of the patient's best interests?" and turning to the "least intrusive alternative requirement" to answer the question).

[49]     *Id.* at 252.

[50]     *Id.*

[51]     *Id.* at 253.

- 16 -                                                                  **7215**

directed courts to consider, at a minimum, "the information that our statutes direct the treatment facility to give to patients" regarding the proposed treatment, including:

> (A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
>
> (C) a review of the patient's history, including medication history and previous side effects from medication;
>
> (D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and
>
> (E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment[.] [52]

We explained that "[c]onsidering these factors will be crucial in establishing the patient's best interests as well as in illuminating the existence of alternative treatments."[53]

We also cited favorably other sometimes-overlapping factors identified by the Minnesota Supreme Court:

> (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment;
>
> (2) the risks of adverse side effects;
>
> (3) the experimental nature of the treatment;
>
> (4) its acceptance by the medical community of the state; and

---

[52]   *Id.* at 252 (alteration in original) (quoting AS 47.30.837(d)(2)).

[53]   *Id.*

(5) the extent of intrusion into the patient's body and the pain connected with the treatment.[54]

These factors we found relevant in *Myers* are relevant here as well. It is by reference to these factors, therefore, that we review the superior court's decision to authorize OCS's administration of Lexapro and Risperdal over Kiva's objection.

### b.    The *Myers* best interests factors as applied to Lexapro

Kiva asserts that the superior court erred when it concluded as a factual matter that the administration of Lexapro was in Alec's best interests. She argues that the court "failed to properly consider the risk of the proposed medication['s] adverse side effects" and "failed to consider the essentially experimental nature of Dr. Brown's proposal." OCS, on the other hand, urges us to conclude that the superior court's factual findings support its best interests decision because of the evidence in the following areas: (1) Alec's condition, diagnoses, and symptoms; (2) the recommended medications and their side effects; and (3) the strong preference for avoiding inpatient treatment. Because Kiva presented no countervailing medical evidence but relied only on her own lay testimony, OCS contends that the superior court was right to follow Dr. Brown's recommendation for Alec's treatment plan.

The superior court's findings of fact, relying primarily on the testimony of Dr. Brown, did substantially address the *Myers* factors. The court found that Alec's "two acute mental illnesses . . . impede his ordinary development and functioning in academic and personal settings." The court made specific findings about Alec's "diagnosis and

---

**54**    *Id.* (quoting *Price v. Sheppard*, 239 N.W.2d 905, 913 (Minn. 1976)). We subsequently clarified that the Minnesota factors were "helpful" and "sensible," meaning "to the extent they differ from the *Myers* factors, their consideration by Alaskan courts is favored but not mandatory." *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180-81 (Alaska 2009).

prognosis," his "predominant symptoms" with and without Lexapro, and his treatment history, including attempts to treat him without medication.[55] The court also made findings about Lexapro's "black-box" warning against pediatric use, as well as about the drug's "purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, . . . and risks of other conditions."[56] And the court discussed Lexapro's use with mood stabilizers.

*Myers* requires only that the court consider the relevant factors; it does not dictate the weight the court gives them.[57] Here the superior court did not err by concluding, based on its findings, that the State had shown by clear and convincing evidence that treatment with Lexapro was in Alec's best interests.[58]

---

[55] *Myers*, 138 P.3d at 252.

[56] *Id.*

[57] *Id.*; *see also In re Jacob S.*, 384 P.3d 758, 772 (Alaska 2016).

[58] The parties dispute whether Alec was actually at risk of being institutionalized. We need not address this issue. Regardless of this potential negative outcome of not treating Alec, the superior court adequately considered the potential benefits and costs of administering Lexapro.

**4.      There were no available treatments less intrusive than Lexapro**.

"[T]he patient's best interests [must be] considered in light of any available less intrusive treatments."[59]  Proving that there are no better alternatives is part of the State's burden.[60]  "[T]he alternative must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."[61]

In *Huffman v. State*, the parents said they would consent to two different types of tuberculosis tests that did "not require inserting any substance into the body," and we acknowledged that these could be "less restrictive alternatives."[62]  But given the limited information about the alternatives in the record, we remanded for the superior court to decide whether the Huffmans' proposals, or others, would be effective in satisfying the State's compelling interest in preventing the spread of tuberculosis.[63]

Our decision in *Bigley v. Alaska Psychiatric Institute*[64] came shortly after *Huffman*.  *Bigley* involved "a petition by API to administer psychotropic medication to

---

[59]      *Myers*, 138 P.3d at 252; *see also Huffman v. State*, 204 P.3d 339, 347 (Alaska 2009) ("The final step in a privacy analysis is to inquire whether the State has demonstrated that 'no less restrictive means could advance' the compelling interest it has articulated." (quoting *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997))).

[60]      *See Huffman*, 204 P.3d at 347.

[61]      *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009).

[62]      *Huffman*, 204 P.3d at 347.

[63]      *Id.*

[64]      208 P.3d 168.

an unconsenting adult" who had been diagnosed with paranoid schizophrenia.[65] Bigley proposed an alternative plan by which API would provide him food and shelter while allowing him to "come and go from API as he wishe[d]."[66] Bigley also asked that API "pay for a reasonably nice apartment" for his use and provide staff support that would "enable him to be successful in the community."[67] The superior court rejected this proposed alternative and granted API authority to administer psychotropic medications.[68]

On appeal, though some *Myers* issues became moot, we considered the final element in the *Myers* constitutional test — whether API's proposal was the least restrictive alternative.[69] We clarified that as part of the constitutional balancing test, the superior court must consider any proposed alternative to determine whether it is "actually . . . available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."[70] We explained that "[a]ssessing the feasibility and likely effectiveness of a proposed alternative is in large part an evidence-based factual inquiry by the trial court."[71]

---

[65]     *Id.* at 172.

[66]     *Id.* at 177.

[67]     *Id.*

[68]     *Id.* at 178.

[69]     *Id.* at 179, 185-87.

[70]     *Id.* at 185 (citing *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 267 (Alaska 2004)).

[71]     *Id.* ("While this inquiry involves a balancing of legal rights and interests, it is also a fact-intensive inquiry.").

We affirmed the superior court's finding that treatment with psychotropic medications was the least restrictive alternative, in large part because the superior court found that Bigley's proposal "faced practical obstacles to being implemented at all" and was therefore not feasible.[72] We also affirmed the finding that Bigley's proposal would not be effective in satisfying the State's interest because it "would not likely provide Bigley with the needed therapeutic benefits, and that API's proposed use of medication offered a better chance of improving Bigley's functioning and helping him to address his basic needs."[73]

The question for the superior court in a case such as this, thus, is whether the State has demonstrated that the parent's proposed alternatives to medication are not actually available.[74] If a parent's proposed alternatives are not feasible or would not be effective in satisfying OCS's compelling interest in caring for a child in its custody, they are not available less intrusive treatments.[75]

---

[72]     *Id.* at 186.

[73]     *Id.* at 187.

[74]     *See id.* at 185.

[75]     *See id.* ("Although the state cannot intrude on a fundamental right where there is a less intrusive alternative, the alternative must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."); *Huffman v. State*, 204 P.3d 339, 347 (Alaska 2009) ("The final step in a privacy analysis is to inquire whether the State has demonstrated that 'no less restrictive means could advance' the compelling interest it has articulated."); *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 252 (Alaska 2006) ("[A]dequate protection of [the fundamental right to refuse psychotropic medication] can only be ensured by an independent judicial determination of the patient's best interests considered in light of any available less intrusive treatments.").

Kiva points to alternatives she proposed to the superior court that could have alleviated some of Alec's symptoms, including family therapy, increased visitation with her, and visitation with other family members. But we conclude that the superior court did not err in finding that Lexapro was the least intrusive treatment available.

The court concluded that "[t]he proposed medication recommendation is well-considered and the least restrictive means necessary to alleviate [Alec's] psychiatric symptoms in an out-patient treatment setting." The court found that Dr. Brown's general "goal [was] to avoid the need for inpatient services," and that Lexapro was not his first treatment option; Dr. Brown first attempted less invasive therapeutic means. But "[b]ehavioral and therapeutic interventions have failed to alleviate [Alec's] symptoms, despite consistent intervention and the passage of a clinically reasonable period of time." Only when Alec's symptoms persisted and increased in severity despite these interventions did Dr. Brown recommend placing him on Lexapro. The superior court found that this recommendation resulted "from a failure of those therapeutic interventions" and that medication was the "least restrictive means necessary to alleviate [Alec's] psychiatric symptoms."

The court's conclusion implicitly rejected Kiva's argument that consistent visitation between her and Alec was a feasible less restrictive alternative. Although Dr. Brown acknowledged that consistent visitation would "help this kid not be so sad," he explicitly denied that it could substitute for medication. And Kiva's history of visitation challenges and cancellations supports a conclusion that consistent visitation was unlikely. Kiva had had difficulties with telephone communication, scheduling, and transportation, and her primary OCS caseworker testified that the failed visits were hard on Alec. The record supports a finding that concentrating on increased visitation with Kiva could not feasibly satisfy OCS's compelling interest in providing Alec with medical care.

Kiva also suggested enhancing Alec's connection with other family members as an alternative to medication. At the time of the hearing, Alec was consistently meeting with his grandmother and sister once a week. Kiva also argued for family therapy, an option OCS had considered but not yet employed. But again, Dr. Brown made clear his opinion that he would recommend such therapies only in conjunction with medication, not in lieu of it. Although OCS did not show that increased family visits and family therapy were not feasible, it did carry its burden of proving that, absent medication, they would not be effective in satisfying its compelling interest in Alec's mental health.

In sum, while the superior court made few explicit findings on Kiva's proposed alternatives, the record supports its conclusion that Lexapro was the least restrictive alternative for addressing Alec's psychiatric symptoms. We conclude that the court did not clearly err in holding that administration of Lexapro was in Alec's best interests "in light of any available less intrusive treatments."[76]

### B.     The Conditional Authorization Of Risperdal Was Premature.

In addition to the antidepressant Lexapro, the superior court granted OCS the authority to consent to the administration of Risperdal as an atypical antipsychotic, or mood stabilizer, "as necessary, as determined and prescribed by [Dr. Brown.]" The court related the details of Dr. Brown's treatment plan for Alec in its findings of fact. The decision whether to increase the dosage of Lexapro from five milligrams to ten would occur "at one to two months" into the treatment regime and would depend on whether Alex was "experienc[ing] reprieve within a reasonable period of time." Alternatively, treatment with Lexapro would halt at this point "[i]f suicidality emerges."

---

[76]     *Myers*, 138 P.3d at 251-52.

But if treatment with Lexapro continued at the ten-milligram dosage level and Alec's "symptoms persist[ed]," Dr. Brown would consider other alternatives: he might "try another antidepressant or introduce a very small dose of an atypical antipsychotic [such as Risperdal] alongside Lexapro" to act as a mood stabilizer. The time frame for these further decisions is unstated in the court's findings, though the court cited Dr. Brown's testimony "that a patient typically remains on antidepressants for nine months to a year" and "[i]t is not desirable for a patient to remain on antidepressants indefinitely."

On appeal Kiva argues that the superior court failed to adequately consider the severity of Risperdal's potential side effects, the experimental nature of Dr. Brown's proposal, and the possibility that the proposal made unwarranted assumptions about Alaska Native and non-Native children's different responses to treatment. Kiva also argues that the court should have held a second hearing to determine whether to authorize the administration of Risperdal rather than authorizing its use as a future option. We find Kiva's last argument persuasive and consider it unnecessary to address the others.

> **1.  A determination whether Risperdal was the least intrusive available treatment should have awaited a later hearing.**

Responding to Kiva's arguments about the open-ended nature of the Risperdal authorization, OCS contends that the superior court heard specific evidence from Dr. Brown regarding when and why he would use a mood stabilizer and incorporated that testimony into its order by making the administration of any mood stabilizer dependent on Dr. Brown's future recommendation. OCS contends that because the court already heard evidence sufficient to support the future administration of Risperdal, a second hearing would be burdensome and impractical.

We explained in *Myers* that "[t]he constitution itself requires courts, not physicians, to protect and enforce" the fundamental rights at issue.[77]  Although the balancing "certainly must be fully informed by medical advice received with appropriate deference, in the final analysis the answer must take the form of a legal judgment that hinges *not on medical expertise* but on constitutional principles aimed at protecting individual choice."[78]

On the other hand, courts have neither the time nor the expertise to micromanage medical treatment plans that are proposed by qualified medical experts. It may be in some cases that a medical care provider is able to map out a decision tree with enough specificity that a court can approve it consistent with the *Myers* test; we do not mean to preclude that possibility.  But we conclude in this case that the superior court was not in a position to make a "less restrictive means" determination with respect to Risperdal and that it should have waited until the progress of Alec's treatment plan required that the determination be made.

Whether Dr. Brown would eventually prescribe Risperdal depended on Alec's response to Lexapro at five- and ten-milligram dosages and also, possibly, on Alec's response to a different antidepressant.  Whether to prescribe Risperdal was a decision that was apparently at least several months in the future.  And Risperdal has serious side effects that counsel caution in any decision to use it, as the superior court acknowledged. Dr. Brown testified that Risperdal's "pretty significant side effects" may include tremors, muscle stiffness, and "akathisia[,] which is sort of like a motor restlessness."  He described a metabolic change — hyperprolactinemia — which can

---

[77]     *Id.* at 250.

[78]     *Id.* (emphasis added).

cause gynecomastia (the growth of mammary tissue in males) and which, though "not very common," is more common with Risperdal than with other atypical antipsychotics. He explained another possible side effect, tardive dyskinesia, as causing muscle rigidity, tremors, "and sometimes difficulty with walking and ultimately swallowing"; he described it as "very, very, very similar to Parkinson's disease" and explained that it could be permanent, unlike other possible side effects that "if you stop the medication, they will go away."

An additional consideration is that if Lexapro proves ineffective alone, the situation may have changed in the intervening months in ways that make it unnecessary to authorize further medication over Kiva's objection. Alec's progress in therapy, improvements in Kiva's exercise of visitation, or other developments may suggest feasible alternatives to medication that deserve the court's consideration. Further attempts to discuss Alec's status with Kiva may bring her and OCS closer together on his treatment plan. Upon seeing how Alec responds to Lexapro, Kiva may be willing to consent to Dr. Brown's next recommendation, be it a different antidepressant or the addition of a mood stabilizer, in which case there would be no need to burden her parental rights by overriding her objection.[79]

Given the serious risks of Risperdal and the possibility of changed circumstances in the time frame at issue, we conclude it was error to find that the open-ended authorization to administer the drug in the future was the least intrusive alternative.

---

[79]     As mentioned above, the superior court noted Kiva's testimony that she "might be willing to consent at some indefinite point in the future once she feels all options have been exhausted and it's truly necessary."

### 2. An order authorizing medication over a parent's objection should be judicially reviewed at least every 90 days.

Kiva argues that the superior court should have placed a time limit on OCS's authority to act on Dr. Brown's recommendation, and she analogizes to the time limits imposed in other types of involuntary treatment or commitment proceedings. For example, when OCS places a child in need of aid in a secure residential treatment center, the superior court is required to review the placement at least every 90 days.[80] At the review hearing, the court assesses "the testimony of a mental health professional" to determine whether the child's needs can be addressed in a less restrictive setting.[81] If not, then the court may authorize continued residential psychiatric treatment until the next 90-day hearing.[82]

In involuntary commitment proceedings, the court limits placement to 30 days, 90 days, or 180 days.[83] Upon petition and hearing, the court may order a 30-day commitment, then an additional 90-day commitment, then an unlimited number of 180-

---

[80]   AS 47.10.087(b).

[81]   *Id.*

[82]   *Id.*

[83]   AS 47.30.730, .735, .755, .770.

day commitments.[84] But any "order of commitment may not exceed 180 days."[85]

Given the importance of the parent's fundamental constitutional rights in cases like this one — along with the necessity that judicial decision-making be fully informed about the patient's therapeutic progress, changes in the parent's perspective, and the development of any available less intrusive treatments — we conclude that courts should regularly review treatment authorizations that are ordered over the parent's objection. To determine a reasonable time line we look to the limits imposed by statute in the analogous settings described above. We conclude that for courts to ensure that they are exercising their oversight responsibilities under *Myers*,[86] they should set review hearings at least every 90 days, as they do now in cases involving the placement of children in need of aid in secure residential treatment centers.[87]

### C. The Superior Court's Order Did Not Need To Be Predicated On A Specific Finding That Kiva Lacked Capacity To Consent Or That Her Refusal To Consent Was Unreasonable Or Unjustified.

Finally, Kiva argues that before allowing Alec to be medicated over her objection, the superior court had to make a preliminary finding that she lacked the capacity to consent to the treatment or that her objection was unreasonable or without justification. Kiva analogizes to the State's authority to override the medical preferences

---

[84] AS 47.30.730, .735, .755, .770.

[85] AS 47.30.770(c). At successive commitment hearings, findings of fact from previous commitment hearings are "admitted as evidence and may not be rebutted except that newly discovered evidence may be used for the purpose of rebutting the findings." AS 47.30.740(c), .770(d).

[86] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 249-52 (Alaska 2006).

[87] *See* AS 47.10.087(b).

of a person who has been involuntarily committed, which is predicated on a finding that the patient is incompetent to make those decisions.[88]

But we conclude that the *Myers* constitutional balancing test adequately protects Kiva's parental rights while also considering, as it must, the State's compelling interest in Alec's medical care. The nature of the State's compelling interest differs in different contexts. Sometimes, as in *Myers,* the State's interest in making medical decisions will be compelling because there is no one else competent to do it.[89] But in *Huffman* we did not require a preliminary finding of parental incompetence or that it was unreasonable for the parents to withhold their consent to the tuberculosis skin test.[90] We took note of the school district's compelling interest in preventing the spread of tuberculosis among schoolchildren, and we required the superior court to consider the parents' suggested alternatives "to determine if they adequately [met] the State's needs without unnecessarily infringing on the Huffmans' rights."[91] And in the context of third-party visitation, we have held that courts can order visitation over the objection of fit parents if there is "clear and convincing evidence that it is detrimental to the child to limit visitation with the third party to what the child's otherwise fit parents have determined to be reasonable."[92]

---

[88]     *Myers*, 138 P.3d at 242-43.

[89]     *Id.* at 249 ("We readily agree that the state's *parens patriae* obligation does give it a compelling interest in administering psychotropic medication to unwilling mental patients in some situations.").

[90]     *See Huffman v. State*, 204 P.3d 339, 346-47 (Alaska 2009).

[91]     *Id.*

[92]     *Ross v. Bauman*, 353 P.3d 816, 828-29 (Alaska 2015).

Each of these situations involves the burdening of fundamental rights. But in each context the fundamental right can be burdened without violating the constitution if the burden is justified by a compelling State interest, whether it be caring for the medical needs of an incompetent person, guarding the health of schoolchildren, or preventing clear detriment to a child through an order for third-party visitation. That the State's interest is readily demonstrated by the patient's incompetence in a case of involuntary commitment does not mean that it cannot be demonstrated by other evidence in other types of cases. Here, the parties do not dispute that OCS has a compelling interest in providing adequate and necessary medical care for children in its custody.

Kiva's rights are also protected by the *Myers* test's "least intrusive means" requirement, which requires the court to consider whether a parent's proposed alternatives are unreasonable or unjustified.[93] Again, Kiva concedes that the court did that here: "[T]he trial court addressed at length Kiva's reasons for objecting to medicating Alec, ultimately concluding that [her] refusal" was "contrary to Alec's welfare." Under the *Myers* test, a parent's refusal to consent *because there is a reasonable and effective alternative* to OCS's proposed treatment plan should result in a denial of OCS's request to burden the parent's rights.

We conclude that the *Myers* test is effective in protecting the fundamental constitutional rights at issue here. It did not require a preliminary finding that Kiva lacked the capacity to consent or that her objections were unreasonable or unjustified; the superior court did not err by failing to make such a finding.

---

[93]     *See Myers*, 138 P.3d at 252,

## V. CONCLUSION

We AFFIRM the superior court's grant of authority to OCS to approve the administration of Lexapro over Kiva's objection. We REVERSE the superior court's grant of authority to approve the administration of Risperdal and REMAND for further proceedings consistent with this opinion.

STOWERS, CHIEF JUSTICE, concurring.

I agree with Part IV.A of the opinion – the Lexapro issue. I have reservations about Part IV.B – the Risperdal issue – because I think Dr. Brown probably provided sufficient information and justification for his contingent plan to use Risperdal if the child's response to Lexapro (or lack thereof) requires the addition of a mood stabilizer in the future. I think the issue is a close call and reluctantly concur because it is a question upon which reasonable minds may differ. I agree with the opinion that "courts have neither the time nor the expertise to micromanage medical treatment plans that are proposed by qualified medical experts."[1] I am able to concur with the opinion because the sentence immediately following allows that "[i]t may be in some cases that a medical care provider is able to map out a decision tree with enough specificity that a court can approve it consistent with the *Myers* test."[2] In this case, I believe Dr. Brown did this, but again, reasonable minds can differ, and as long as he is not foreclosed entirely from making a treatment plan containing a contingency plan for the future if circumstances warrant, I do not object to giving him another opportunity to do so consistent with the *Myers* test.

---

[1]    Opinion at 26.

[2]    *Id.*