NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity<br>for the Hospitalization of<br><br>SHARON W. | )<br>) Supreme Court No. S-17836<br>)<br>) Superior Court No. 3AN-20-01172 PR<br>)<br>) MEMORANDUM OPINION<br>) <u>AND JUDGMENT</u>*<br>)<br>) No. 1875 – February 9, 2022<br>) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Renee McFarland, Deputy Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Sharon W. Thomas S. Flynn, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Chief Justice, Maassen, Carney, and Borghesan, Justices.

## I.    INTRODUCTION

A woman appeals the superior court's order committing her to the Alaska Psychiatric Institute (API) for treatment for 30 days and its order authorizing her treating physician to administer psychotropic medications over her objection. We conclude that the superior court's finding that the woman was gravely disabled is supported by the

---

\*    Entered under Alaska Appellate Rule 214.

evidence and that the medication order is sufficiently detailed and limited to comply with constitutional requirements. We therefore affirm both orders.

## II. FACTS AND PROCEEDINGS

### A. Emergency Detention And Hospitalization Evaluation Petition

Sharon W.[1] was detained at Hiland Mountain Correctional Center "on a mental health hold" after criminal charges against her had been dismissed. A psychiatrist asked that Sharon be placed in emergency detention because she was "gravely disabled"; he diagnosed her as suffering from several psychological disorders, including bipolar disorder, psychosis, and anxiety. That same day a Department of Corrections (DOC) counselor filed a petition asking that Sharon be hospitalized for a mental health evaluation.[2] The counselor noted that Sharon had been "cognitively disorganized and manic" since entering DOC custody several months before and was "refusing [to take] medications," take a shower, or leave her cell. The counselor said that Sharon was "unable to articulate a coherent plan for how she [would] care for herself when discharged" and concluded that she was "gravely disabled."

A superior court magistrate judge recommended that the petition for hospitalization for evaluation be granted. The superior court approved the recommendation and Sharon was transferred to API.

### B. Petition For 30-Day Commitment And Petition To Involuntarily Administer Psychotropic Medication

A week later Sharon's treating psychiatrist, Dr. Andrew Pauli, and a licensed clinical social worker filed another petition asking that Sharon be committed for

---

[1]     To protect Sharon's privacy, we do not use her full name.

[2]     A petition filed pursuant to AS 47.30.710(a) and AS 47.30.715 seeks authorization to hospitalize a respondent for evaluation for up to 72 hours.

30 days for treatment.[3] Dr. Pauli diagnosed Sharon with schizophrenia, noting that she had "a pronounced set of delusions which interfere[d] with her reality testing and judgment." He identified a "pronounced thought disorder which interfere[d] with [Sharon's] ability to communicate directly" and said she was "unable to describe precisely how she would provide for herself, . . . where she would live, and where she would obtain food" once released. Given these concerns, Dr. Pauli asserted that Sharon was gravely disabled as defined in AS 47.30.915(7)(A).

Dr. Pauli also filed a petition seeking court approval for the administration of psychotropic medication. Asserting that Sharon was incapable of giving informed consent, he requested the authority to involuntarily administer a list of drugs that would treat her psychosis and address any possible side effects. According to Dr. Pauli, there were no less intrusive treatment options available for Sharon, but the proposed drugs in some combination were likely to help her.

### C. Hearing On The 30-Day Commitment Petition And Hearing On The Petition To Involuntarily Administer Psychotropic Medication

Magistrate judges presided over two evidentiary hearings, the first on the 30-day commitment petition and the second, a day later, on the involuntary medication petition. At the first hearing three people testified: Dr. Pauli, Sharon, and Sharon's mother. Sharon objected persistently and somewhat incoherently throughout the hearing until the court informed her that she would be removed if the interruptions continued. After one more warning the court ordered Sharon removed from the hearing room.

---

[3]     A petition filed pursuant to AS 47.30.730 seeks authorization to commit a patient to a treatment facility for up to 30 days.

Three people testified at the next day's medication hearing: Dr. Pauli, the court visitor,[4] and Sharon. Dr. Pauli was called first, but before he could begin his testimony Sharon volunteered that she was involved in a child abduction case, that she was the royal ambassador to Russia, and that API had committed copyright violations. As the hearing proceeded the court tried unsuccessfully to keep her from talking over witnesses; it eventually ordered that she be removed from the hearing room.

### D.    The 30-Day Commitment And Involuntary Medication Orders

The magistrate judge recommended approval of the 30-day commitment petition, and the superior court reviewed the record and signed the order. The court found by clear and convincing evidence that Sharon had been advised of the need for treatment but had not voluntarily accepted it. Relying on Dr. Pauli's testimony and Sharon's behavior in the courtroom, the court also found that Sharon was mentally ill. The court found that Dr. Pauli's testimony credibly established that Sharon was too delusional and disorganized to live independently in the community; the court found that she would be unable to secure basic food or shelter in her current condition given that she was unable to speak rationally or make plans for her safe release.

The superior court also granted the involuntary medication petition on the magistrate judge's recommendation. The court found by clear and convincing evidence that Sharon was not competent to provide informed consent, and it approved Dr. Pauli's proposed list of medications. It noted the drugs' purposes, their proposed dosages, the potential side effects, their FDA approval, and the limiting principle that treatment should "use the least amount of medication necessary for effectiveness."

---

[4]    AS 47.30.839(d) requires the superior court to appoint an independent court visitor to assist in investigating whether the respondent has the capacity to give or withhold informed consent to the administration of medication.

Sharon appeals both the 30-day commitment order and the involuntary medication order.

## III. STANDARD OF REVIEW

" 'Factual findings in involuntary commitment or medication proceedings are reviewed for clear error,' and we reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[5]

"Whether those findings meet the involuntary commitment and medication statutory requirements is a question of law we review de novo."[6] "We apply our independent judgment to the interpretation of [both] the Alaska Constitution and statutes, adopting 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[7] "Whether a particular medical treatment is in a patient's best interests is . . . a mixed question of fact and law."[8]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Finding By Clear And Convincing Evidence That Sharon Was Gravely Disabled.

Sharon first contends that the superior court's finding of grave disability is not supported by sufficient evidence. "Before the superior court can involuntarily commit a person it must find, by clear and convincing evidence, that the person is

---

[5] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019)).

[6] *Id.* at 764.

[7] *Wetherhorn*, 156 P.3d at 375 (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918.

[8] *Kiva O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 408 P.3d 1181, 1186 (Alaska 2018).

'mentally ill and as a result is likely to cause harm to [self] or others or is gravely disabled.' "[9] Under AS 47.30.915(9)(A), a person is gravely disabled if, "as a result of mental illness," the person "is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken." "Clear and convincing evidence is 'that amount of evidence which produces . . . a firm belief or conviction about the existence of a fact to be proved.' "[10]

Sharon concedes that Dr. Pauli's testimony may have established that she "could have difficulty in securing food if she were released and that she did not want to provide [him] with details about her living situation upon release," but she contends that his testimony was nonetheless insufficient to meet the relevant statutory definition of "gravely disabled": that "serious accident, illness, or death [was] highly probable if care by another [was] not taken."[11] Sharon contends that Dr. Pauli focused on others' likely reaction to Sharon in the community rather than her own abilities; he testified that "she would likely end up one of those people that goes to the grocery store or goes to the street and . . . starts yelling at people . . . . And then the police come . . . and she'll be right back [at API]."

But Sharon's ability to effectively communicate her needs to others is plainly relevant to her ability to function safely in the community, and for this the court relied not just on Dr. Pauli's testimony but also on its own observations of Sharon during the hearings, which it explicitly gave "more weight." The court noted that Sharon

---

[9]    *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 86-87 (Alaska 2012) (alteration in original) (quoting AS 47.30.735(c)).

[10]    *Id.* at 87 (quoting *In re Johnstone*, 2 P.3d 1226, 1234-35 (Alaska 2000)).

[11]    *See* AS 47.30.915(9)(A).

"interrupt[ed] parties and the court many, many times, shout[ed], mov[ed] around the courtroom, and ma[de] delusional and incoherent statements." The court also noted that Sharon had to be removed from the hearing room twice because of her disruptive behavior. Dr. Pauli's testimony and the court's first-hand observations provided adequate support for the finding that Sharon was unlikely to be able to care for herself independently and was therefore gravely disabled.

Sharon also argues that the court erred by accepting Dr. Pauli's testimony that she was delusional, because some of her "delusions" had a factual basis. At the hearing she claimed, among other things, that she was "the royal ambassador to the Soviet Union" and was descended from a prominent Russian-Inupiaq woman entrepreneur. Sharon's mother confirmed the last claim. Sharon now contends that Dr. Pauli failed to understand this important ancestor's significance in Sharon's life, and that the superior court overlooked the doctor's failure and "how acknowledging that relationship may have altered [Sharon's] presentation" at the hearing.

But Sharon does not suggest "how acknowledging that relationship" may have changed the course of proceedings. The magistrate judge did not cite the content of Sharon's alleged delusions when making findings on her mental illness; she gave considerably more weight to Sharon's conduct, such as her lack of "control over her body faculties as she was . . . in an excited state moving around and shouting and yelling and waving her hands around." The magistrate judge also cited Sharon's "very disorganized state of thinking and her inability to essentially finish sentences and construct meaningful sentences," all of which is evident from our record. Even assuming the truth of Sharon's claim about her ancestry, there is no clear error in the finding that

she was gravely disabled.[12]

**B.      The Superior Court Did Not Err By Authorizing The Involuntary Administration Of Psychotropic Medication.**

Dr. Pauli's proposed medication regimen included six drugs: two antipsychotics, three drugs intended to treat the antipsychotics' possible side effects, and one drug that could both address side effects and "decrease paranoia . . . generally." Dr. Pauli specified that the two antipsychotics would not be "used at the same time . . . . [I]f one doesn't work, you run that dose up. If that one doesn't work or if there are side effects that interfere with adequate dosage, then the idea would be . . . to go to the other one." The court approved this proposal, noting the doctor's intent to "begin with one antipsychotic" and "have the flexibility to move to a second medicine if [the first one] does not help her" and specifying that the "[t]reatment of side effects will similarly use the least amount of medication necessary for effectiveness."

Sharon contends that the medication order gave too much deference to Dr. Pauli's future exercise of discretion, in violation of our precedent holding that it is the court's responsibility to decide the least intrusive treatment regimen as a question of constitutional law. We have held that "[t]he right to refuse psychotropic medication is a fundamental right protected by the Alaska Constitution's guarantees of liberty and

---

[12]      Additionally, the court was not obliged to believe Sharon's claim about her ancestry despite her mother's testimony that it had some factual basis. "It is the trial court's function and not that of a reviewing court to determine the credibility of witnesses and the weight to be given evidence." *Olsen & Sons Logging, Ltd. v. Owens*, 607 P.2d 949, 953 (Alaska 1980). Notably, Sharon's mother also testified that she did not believe her daughter was mentally ill or "need[ed] any help with her thinking or anything like that," and the magistrate judge specifically rejected this testimony, citing it as a reason why returning Sharon to her village for care by family members was not a viable option.

privacy,"[13] extending "equally to mentally ill persons."[14]  "When no emergency exists, then, the [S]tate may override a mental patient's right to refuse psychotropic medication only when necessary to advance a compelling state interest and only if no less intrusive alternative exists."[15] In determining whether there is a less intrusive alternative, the court must make "an independent judicial best interests determination . . . to ensure that the proposed treatment is actually the least intrusive means of protecting the patient."[16]

We conclude that the medication order complies with these rules.  As noted above, the list of approved medications incorporated the caveats that the antipsychotic drugs would be used sequentially, as necessary, and not both at once, and that any medication administered would be in "the least amount . . . necessary for effectiveness." The court recited in detail the facts that supported the recommended medications, including the court visitor's observations and independent conclusion that Sharon had "not articulated a reasonable objection to medication"; the court's own observations of Sharon's "delusional thinking and disordered thought," along with her denial that she suffered from a mental illness; and Dr. Pauli's testimony about the proposed medications, their purposes and dosages, and their potential side effects.  The court made note of Dr. Pauli's unsuccessful attempts to discuss the medications with Sharon and his belief that she could not "participate in her treatment plan through a rational thought process," "give or withhold informed consent to the administration of the necessary medications," or "appreciate the consequences of a choice not to take medications."  The court

---

[13]     *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 187 (Alaska 2009).

[14]     *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006) (quoting *Rivers v. Katz*, 495 N.E.2d 337, 341 (N.Y. 1986)).

[15]     *Id.*

[16]     *Id.* at 250.

concluded that "[w]ithout treatment, it is unlikely that [Sharon] would get better and more likely she would remain in her current state."

To support an argument that the court failed to mandate a sufficiently detailed "decision tree" for Dr. Pauli's medication plan, Sharon cites *Kiva O. v. State, Department of Health & Social Services*, which involved a child in State custody.[17] The State sought to administer antidepressants over the mother's objection; we reversed an order authorizing the child's physician to switch to an alternative medication plan as much as nine months to a year later.[18] We noted that much could change in that time frame, including not only the child's condition but also the mother's receptivity to the treatment.[19] It was therefore "error to find that the open-ended authorization to administer [the alternative antidepressant] in the future was the least intrusive alternative."[20]

The order we review in this case is significantly different, and it is much like one we recently approved. In *In re Hospitalization of Keegan N.* we affirmed an order authorizing the treating physician to follow the same general treatment plan, beginning with one antipsychotic drug and, if it did not prove effective, switching to a second identified drug without having "to apply for reauthorization."[21] We noted that "the magistrate judge was deciding the treatment that should begin immediately, at the outset of a 30-day commitment, and to last no longer than the commitment period," and

---

[17]     408 P.3d 1181, 1183 (Alaska 2018).

[18]     *Id.* at 1192-93.

[19]     *Id.* at 1193.

[20]     *Id.* at 1193-94.

[21]     No. S-17443, 2020 WL 5230552, *6 (Alaska Sept. 2, 2020).

that deciding on the proper medication "depended on some initial trial and error" that could be left to the doctor's professional judgment within some stated parameters.[22] We noted that there was "not the same 'possibility of changed circumstances in the time frame at issue' as in *Kiva O.*"[23] We concluded that the court "could reasonably decide that the administration of one or the other of the two psychotropic medications listed in the petition would be in the respondent's best interests in the immediate future but that the choice between them was not possible absent some initial experimentation and close observation."[24] We held that the court could therefore "reasonably approve both [antipsychotics] as alternatives subject to the doctor's discretion as he considered the patient response."[25] Given that this case involves the same 30-day commitment period, the same choice of antipsychotic drugs, and a similar order allowing the exercise of the physician's professional judgment within certain parameters, we see no reason to decide it differently.

Finally, Sharon suggests that the medication order "authorized [Dr.] Pauli to switch medications regardless of [Sharon's] capacity and her stated preferences." It should go without saying that involuntary medication is authorized only so long as the respondent is incapable of giving consent. We observed in *In re Hospitalization of Lucy G.* that "[c]ourt-ordered mental health treatment is statutorily limited to 30 days . . . and such treatment may not be provided to any person who has regained

---

[22]     *Id.*

[23]     *Id.* (quoting *Kiva O.*, 408 P.3d at 1193).

[24]     *Id.*

[25]     *Id.*

capacity to consent to or decline treatment."[26]  We do not read the court's medication order in this case as authorizing involuntary treatment regardless of Sharon's capacity; such a reading would be unlawful.

Because the court's medication order demonstrates the court's exercise of its independent judgment and gives the physician sufficient direction to comply with the constitutional requirements, we affirm it.

## V.    CONCLUSION

We AFFIRM the superior court's commitment and involuntary medication orders.

---

[26]     448 P.3d 868, 875 (Alaska 2019).