*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-16697 |
| LUCY G. | ) ) ) ) ) ) ) | Superior Court No. 1JU-17-00138 PR<br><br>O P I N I O N<br><br>No. 7407 – September 13, 2019 |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Louis J. Menendez, Judge.

Appearances: Josie W. Garton, Assistant Public Defender, Callie Patton Kim, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Lucy G. Ruth Botstein, Senior Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

## I.   INTRODUCTION

This is a case of first impression regarding an order for administration of electroconvulsive therapy (ECT) to a catatonic, non-consenting patient. At the superior court hearing, the parties agreed that constitutional standards established in *Myers v. Alaska Psychiatric Institute* for ordering involuntary, non-emergency administration of psychotropic medication also apply to involuntary ECT. The patient now argues that

there should be heightened standards for ordering involuntary ECT and that, in any event, the superior court's *Myers* analysis was legally deficient. We hold that the superior court did not plainly err by applying the existing *Myers* constitutional standards to authorize involuntary ECT to the non-consenting patient. We also hold that the superior court made sufficient findings related to each relevant, contested mandatory *Myers* factor. In our independent judgment, these findings support the court's involuntary ECT order. We affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Underlying Facts

In March 2017 police officers found Lucy G.[1] in an Anchorage parking lot, wet and shivering. She was taken to a local hospital, where she initially exhibited "agitated, self-harming, and disoriented" behaviors requiring sedation for her and the staff's safety. Lucy, who was calm but unresponsive by the end of the day, was diagnosed as catatonic. Hospital staff also noted her prior schizophrenia diagnosis and psychotropic medication prescriptions, as well as hospitalization the prior month. After a petition by hospital staff, the superior court authorized Lucy's hospitalization for an involuntary commitment evaluation.[2]

Lucy was transported to a Juneau hospital for evaluation. The hospital's medical director for behavioral health, a Juneau psychiatrist, diagnosed Lucy with catatonia. In April the psychiatrist petitioned the superior court to: involuntarily commit

---

[1]     We use a pseudonym to protect Lucy's privacy.

[2]     *See* AS 47.30.700(a) (discussing evaluation procedure for initial involuntary commitment).

Lucy for 30 days;[3] order involuntary administration of psychotropic medication;[4] and order involuntary ECT.[5] The psychiatrist's prognosis for Lucy's catatonia with psychotropic medication was only "[f]air," but her prognosis with ECT was "[e]xcellent."

## B. Hearing Testimony Regarding Lucy

The superior court held a contested hearing a few days later.[6] The court heard testimony from the petitioning Juneau psychiatrist and a Fairbanks psychiatrist who would supervise Lucy's treatment at the only facility then providing ECT in Alaska. Both psychiatrists were qualified by the court as experts in mental illness diagnosis and ECT treatment. The court-appointed visitor[7] and a public defender investigator who had worked on her prior commitment cases also testified.

The Juneau psychiatrist testified that Lucy had been unresponsive to people or tactile stimuli since her hospital admission and that she was unable to tend to her most basic needs. The psychiatrist stated that Lucy was at risk of bed sores, pneumonia, and blood clots due to immobility; infection from urine retention; and complications from

---

[3]    *See* AS 47.30.730(a) (discussing 30-day commitment petitions).

[4]    *See* AS 47.30.839 (discussing court-ordered medication administration).

[5]    *See* AS 47.30.825(f) (discussing court-ordered ECT administration).

[6]    *See* AS 47.30.735 (discussing 30-day commitment petition hearing); AS 47.30.839(e) (discussing court-ordered medication petition hearing).

[7]    When a court considers a petition to authorize psychotropic medication, a "visitor" must be appointed to "assist the court." AS 47.30.839(d). The visitor's duties include "gather[ing] and provid[ing] information to the court on . . . the patient's present condition [and] . . . conduct[ing] a search for any prior 'expressed wishes of the patient regarding medication.' " *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 243-44 (Alaska 2006) (quoting AS 47.30.839(d)).

intravenous-therapy fluids and a potential feeding tube. The psychiatrist said that despite increasing dosages of psychotropic medication, there had been no "significant change." The psychiatrist explained that improvements from psychotropic medication usually occur within the first week: "[I]f you don't see an improvement within those first several days, you're not likely to see much of anything after that." The psychiatrist noted that, compared to Lucy's prior hospitalizations, this hospitalization constituted Lucy's longest documented unresponsiveness and the time between hospitalizations had been decreasing.

The Juneau psychiatrist testified to an 80% to 90% chance of improving Lucy's catatonia with ECT. The psychiatrist discussed ECT's common side effects, including headache, jaw pain, muscle aches, and dental issues. The psychiatrist also explained that, although some people complain of memory loss, formal neurological comparisons before and after ECT show patient "memory is actually better." The psychiatrist believed that ECT was Lucy's least restrictive treatment alternative because her catatonia was worsening every day, she was not responding to psychotropic medication, and there was a risk that without treatment the catatonia would become irreversible. The psychiatrist stated that if Lucy had been living in any other state, her doctors would have considered ECT to treat her catatonia six months earlier.

The Fairbanks psychiatrist had not yet examined Lucy but had consulted with the Juneau psychiatrist. The Fairbanks psychiatrist testified that she would conduct an independent evaluation prior to administering ECT. She agreed that, because Lucy was "essentially paralyzed from her psychiatric illness," the standard of care called for immediate ECT treatment, the "gold standard treatment for catatonia." The Fairbanks psychiatrist estimated that significant results from ECT could be seen within nine treatments and that sustained benefits could require continued outpatient treatment.

Like the Juneau psychiatrist, the Fairbanks psychiatrist expected that a patient's memory would improve after ECT. But the Fairbanks psychiatrist noted ECT's other potential side effects, including the "approximately 1 in 10,000" chance of death, as well as risks related to the required anesthesia: stroke, heart attack, and blood clots. Like the Juneau psychiatrist, the Fairbanks psychiatrist ultimately believed that involuntary ECT was the least restrictive treatment available to ensure Lucy's safety and was in her best interests. The Fairbanks psychiatrist repeatedly testified that if at any point during the commitment Lucy regained capacity, the psychiatrist would defer to Lucy whether to continue treatment.

The public defender investigator testified that Lucy's only next of kin, her significant other, had passed away in July 2016. The court visitor testified that "the court [was] at a disadvantage because they haven't been able to see" Lucy's "dramatic" condition. The visitor stated that Lucy is "gravely disabled, and in need of help. And it doesn't seem like the courses of treatment that have been utilized to date have been effective for her or sustained over any period of time."

## C.    Hearing Testimony Regarding ECT In Alaska

Hearing testimony discussed the basics of ECT treatment. ECT is performed under general anesthesia. A patient receives "the lowest amount of energy required to have an effective seizure" through electrodes placed on the head. Doctors monitor the patient's vital signs and brain waves during the procedure, and a "bite block" is held in place in the patient's mouth.

The Fairbanks psychiatrist testified that she had received specialized training prior to opening Fairbanks Memorial Hospital's ECT treatment center in August

2016. She said that ECT is not an experimental catatonia treatment[8] and that Alaska has "had it in the past, but . . . it's been several years since anyone in the state had a running program." She said that the ECT center was inspected by a national accrediting body, was deemed to have "zero deficiencies," and was "identified . . . as a best practice [institute] for other facilities around the country that have ECT programs." She noted that by the time of Lucy's hearing, the ECT center had provided approximately 200 ECT treatments to 11 voluntary patients. Lucy would be the ECT center's first involuntary patient.

### D. Superior Court's Findings And Conclusions; This Appeal

The superior court found by clear and convincing evidence that Lucy suffered from a mental illness, was gravely disabled, and lacked capacity to give informed consent. The court also found by clear and convincing evidence that involuntary ECT was in Lucy's best interests and that there was "no other reasonable alternative in conjunction with the administration of psychotropic drugs." The court considered the psychiatrists' testimony, citing ECT's "80 to 90 percent response rate" and side effects including "muscular pain, clenched jaw, [and] dental issues." The court found "[t]here may be some issues in terms of, again, one's heart; but there's no evidence of death. And what's been given to me in terms of ECT is the fact that the negatives are far, far, far less than the positives." The court ordered the 30-day commitment and granted the petitions for involuntary psychotropic medication and ECT.

Lucy appeals only the ECT order, arguing that the superior court erred by determining that ECT was in her best interests and by determining that ECT was the least intrusive alternative treatment available to her.

---

[8]     *Cf.* AS 47.30.830(a) (prohibiting experimental treatments involving "significant risk of physical or psychological harm").

## III.  DISCUSSION

### A.  Applying The Existing *Myers* Best Interests Factors — As The Parties Agreed — Was Not Plain Error.

In *Myers v. Alaska Psychiatric Institute* we held that — in non-emergency situations — a court may not authorize administration of psychotropic medications to a non-consenting patient without first determining that the medication is in the patient's best interests and that no less intrusive alternative treatment is available.[9]  The parties agreed at the commitment hearing that the superior court should apply the *Myers* factors to determine whether to order involuntary ECT for Lucy.  But in her appellate briefing Lucy advocates — for the first time — that an additional layer of protection for court-ordered ECT is merited on the ground that ECT is a greater intrusion than psychotropic medication to a patient's autonomy.  Because Lucy did not argue for this heightened standard in the superior court, we review her claim for plain error.[10]

---

[9]     138 P.3d at 239 ("[I]n the absence of emergency, a court may not authorize the state to administer psychotropic drugs to a non-consenting mental patient unless the court determines that the medication is in the best interests of the patient and that no less intrusive alternative treatment is available."); *see also* AS 47.30.915(11) (defining "least restrictive alternative" as "no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient; and . . . involv[ing] no restrictions on physical movement . . . except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury").

[10]     We review unpreserved claims for plain error.  Plain error exists when there is an " 'obvious mistake' that is 'obviously prejudicial.' "  *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (first quoting *Adams v. State*, 261 P.3d 758, 773 (Alaska 2011);  then quoting *State, Dep't of Revenue, Child Support Enf't Div. ex rel. P.M. v. Mitchell*, 930 P.2d 1284, 1288 (Alaska 1997)).

In *Myers* we held that a patient's "right to refuse to take psychotropic drugs is fundamental."[11] We now likewise hold that a patient's right to refuse ECT is fundamental. We have held that "[w]hen a law places substantial burdens on the exercise of a fundamental right, we require the state to 'articulate a compelling' [state] interest' and to demonstrate 'the absence of a less restrictive means to advance [that] interest.' "[12] Because administering involuntary ECT burdens a patient's fundamental rights, the state must: (1) articulate a compelling interest in administering involuntary ECT; and (2) demonstrate that involuntary ECT administration is the least restrictive means to advance that compelling interest.

We "readily agree[d]" in *Myers* that "the state's *parens patriae* obligation does give it a compelling interest in administering psychotropic medication to unwilling mental patients in some situations."[13] But we could not categorically answer when less restrictive means exist.[14] We instead stated that before such treatment could be ordered, an independent judicial determination of the patient's best interests must be made to ensure that the proposed treatment actually is the least restrictive means of protecting the patient.[15]

Although we held that considering a patient's best interests is required as part of the superior court's determination whether involuntary medication is the least

---

[11]     138 P.3d at 248.

[12]     *Id.* at 245-46 (second and third alterations in original) (first quoting *Ranney v. Whitewater Eng'g*, 122 P.3d 214, 222 (Alaska 2005); then quoting *Sampson v. State*, 31 P.3d 88, 91 (Alaska 2001)).

[13]     *Id.* at 249.

[14]     *Id.*

[15]     *Id.* at 250.

restrictive means to advance the state's compelling interest, we subsequently have separated these inquiries.[16] We now clarify that for a particular treatment — involuntary medication or ECT — to be the least restrictive means to advance the state's compelling interest, the superior court must find it both to be in the patient's best interests and the least intrusive treatment option available.

In *Bigley v. Alaska Psychiatric Institute* we explained that the *Myers* inquiry balances "the fundamental liberty and privacy interests of the patient against the compelling state interest under its *parens patriae* authority to 'protect "the person and property" of an individual who "lack[s] . . . capacity." ' "[17] This constitutional balancing test is a "fact-intensive inquiry" because, "[a]lthough the state cannot intrude on a fundamental right where there is a less intrusive alternative, the alternative must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."[18] We recently reiterated in *Kiva O. v. State, Department of Health & Social Services, Office of Children's Services* that

---

[16] *See In re Hospitalization of Linda M.*, 440 P.3d 168, 176 (Alaska 2019) (considering best interests analysis and stating that the "record also supports the independent conclusion that there were no less intrusive alternatives to involuntary medication"); *Kiva O. v. State Dep't of Health & Soc. Servs. Office of Children's Servs.*, 408 P.3d 1181, 1190-92 (Alaska 2018) (discussing inquiries separately); *In re Hospitalization of Jacob S.*, 384 P.3d 758, 772 (Alaska 2016) (discussing best interests but not least intrusive alternative); *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185-88 (Alaska 2009) (discussing inquiries separately).

[17] 208 P.3d at 185 (alteration in original) (quoting *Myers*, 138 P.3d at 249).

[18] *Id.*

"[a]ssessing the feasibility and likely effectiveness of a proposed alternative is in large part an evidence-based factual inquiry by the trial court."[19]

Lucy argues that in addition to — or despite — the *Myers* fact-intensive, no-less-intrusive-alternative inquiry, we should hold as a matter of law that ECT is more intrusive than psychotropic medication, and, therefore, that involuntary ECT can be administered as a last resort only when psychotropic medication will not suffice.  We find Lucy's argument flawed on two bases:  First, her reliance on *Matter of C.D.M.*,[20] a case predating *Myers* by 25 years, to create this heightened standard is misplaced; and second, her request that we rule ECT categorically is more intrusive than psychotropic medication is misdirected — that is a question for the legislature.

In *C.D.M.* we held that a court could not order involuntary sterilization unless the patient's incapacity was permanent and the procedure "absolutely necessary."[21]  Lucy asserts, based on this holding, that a court can order involuntary ECT only as a last resort and not to "circumvent a patient's refusal to take psychotropic medication when competent."  But we premised our decision in *C.D.M.* on the fact that "[s]terilization necessarily results in the permanent termination of the intensely personal right to procreate."[22]  ECT, unlike sterilization, is not designed to permanently abridge a fundamental right.  Court-ordered mental health treatment is statutorily limited to 30 days; extending beyond that time requires a new court hearing and constitutional

---

[19]     408 P.3d at 1191 (alteration in original) (quoting *Bigley*, 208 P.3d at 185).

[20]     627 P.2d 607 (Alaska 1981).

[21]     *Id.* at 613.

[22]     *Id.* at 612.

inquiry,[23] and such treatment may not be provided to any person who has regained capacity to consent to or decline treatment.[24] Because ECT is not designed to permanently abridge a fundamental right, we decline to apply our *C.D.M.* holding in this context.

We also reject Lucy's policy argument that we should hold as a matter of law that ECT is more intrusive than psychotropic medications. This substantive policy decision rests squarely within the legislature's province.[25] We recognized in *Myers* that many states "have equated the intrusiveness of psychotropic medication with the intrusiveness of [ECT]."[26] And nothing in our current statutory scheme evinces a clearly contrary legislative intent.

Although Title 47 of the Alaska Statutes differentiates between treatment methods in *crisis* situations — authorizing only psychotropic medication in emergencies[27] — there is no indicated preference for psychotropic medication in *non-crisis* situations. And under AS 47.30.772, evaluation and treatment facilities "may administer medication *or other treatment* to an involuntarily committed patient" consistent with other statutory provisions. (Emphasis added.) Within the "other

---

[23] *See* AS 47.30.730-.770.

[24] *See* AS 47.30.825(f) ("A patient capable of giving informed consent has the absolute right to accept or refuse [ECT]. . . . A patient who lacks substantial capacity to make this decision may not be given [ECT] without a court order . . . .").

[25] *Cf. State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 395-96 (Alaska 2007) ("The constitution . . . commits the enactment of all substantive law . . . to the legislature, acting by an affirmative vote of the majority of each house." (citing Alaska Const. art. II, § 14)).

[26] 138 P.3d 238, 242 (Alaska 2006).

[27] AS 47.30.838(a).

statutory provisions" referenced, a court may order ECT for a "patient who lacks substantial capacity" to decide whether to "accept or refuse [ECT]."[28]  These provisions plainly allow for court-ordered, non-emergency involuntary ECT.  We therefore leave to the legislature whether a treatment hierarchy generally should exist.

Having dismissed Lucy's two arguments for a heightened standard, we are unpersuaded that the superior court made an "obvious mistake" by applying only the protective *Myers* analysis — which the parties agreed applied — to this case.

**B.      The Superior Court Did Not Err By Determining That Involuntary ECT Was The Least Restrictive Means To Advance The State's Compelling Interest In Protecting Lucy.**

As part of Lucy's overall challenge to the superior court's finding that involuntary ECT was the least restrictive means to advance the state's compelling interest in protecting her, she challenges the sufficiency of the court's best interests and least intrusive alternative findings under *Myers*.  She first faults the court's nearly illegible, cursory written findings.  But because the court also provided extensive oral findings and conclusions of law at the commitment hearing, we analyze its oral findings.[29]  Lucy also challenges the court's ultimate best interests determination, arguing that the court misweighed the factors.

We first explain why the *Myers* best interests and least intrusive alternative determinations are mixed questions of fact and law and that we will review these determinations by exercising our independent judgment.  We then clarify our previous decisions and discuss why express findings on each relevant, contested *Myers* best

---

[28]      AS 47.30.825(f).

[29]      *See Noey v. Bledsoe*, 978 P.2d 1264, 1276 (Alaska 1999) (concluding that superior court "made detailed oral findings of fact and conclusions of law[, and b]ecause its findings [were] sufficient to permit appellate review, further written findings and conclusions were unnecessary").

-12-                                          **7407**

interests factor are needed to ensure a patient's due process rights are protected and to facilitate appellate review. We finally evaluate the superior court's findings regarding both best interests and least intrusive alternatives to determine whether the court's factual findings are clearly erroneous and whether, as a matter of law, the court erred in its conclusions.

**1.     We exercise our independent judgment when reviewing the superior court's best interests and least intrusive alternative findings as part of its overall least restrictive means determination.**

Our fundamental holding in *Myers* was that, in light of the Alaska Constitution's liberty and privacy guarantees, the existing statutory framework for non-emergency, involuntary treatment with psychotropic medications could be constitutional only if it were overlaid with certain patient protections.[30] Specifically, we held that (1) before such treatment could be ordered, an independent judicial determination must be made about (a) whether such treatment was in the patient's best interests, and (b) whether any less intrusive alternatives exist;[31] and (2) the appropriate standard of proof for these determinations is clear and convincing evidence.[32]

We emphasized in *Myers* that whether a patient's best interests are served by involuntary treatment ultimately "presents a constitutional question," the answer to which "must take the form of a legal judgment" hinging "on constitutional principles

---

[30]     138 P.3d at 245-52, 254; *see Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180 (Alaska 2009) ("Under the standards we announced in *Myers*, constitutional guarantees of liberty and privacy require the court to find by clear and convincing evidence that the involuntary administration of psychotropic medication is in the best interests of the patient and that no less intrusive alternative treatment is available.").

[31]     *Myers*, 138 P.3d at 250, 252.

[32]     *Id.* at 253.

aimed at protecting individual choice" rather than on medical expertise.[33] In *Bigley*, although we did not reach the moot best interests question, we stated that "[t]he inquiry into whether there is a less intrusive alternative itself is a mixed question of fact and law" and that the ultimate determination must be founded on an "evidence-based factual inquiry" into the feasibility and efficacy of any proposed alternative treatment.[34] In *Kiva O*. we stated that we review each inquiry as a mixed question of fact and law.[35]

But we have done little to explore the nature of mixed questions of fact and law in non-jury cases when the difference between underlying factual findings and ultimate legal determinations is not clearly defined,[36] and we therefore are left with the question how to actualize review of these determinations. Sometimes we say broadly that we review the superior court's factual findings for clear error and legal conclusions de novo.[37] Sometimes we say that we review the superior court's factual findings for

---

[33] *Id.* at 250.

[34] 208 P.3d at 185.

[35] 408 P.3d 1181, 1186 (Alaska 2018). We cited *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64, 772 (Alaska 2016), for this proposition with respect to the best interests determination, but it appears that in *Jacob S.* we actually treated both determinations as questions of fact reviewed under the clearly erroneous standard of review. *See id.* at 769, 772.

[36] *Cf.* Alaska R. Civ. P. 52. The Supreme Court has stated that the federal version of Civil Rule 52 does not "furnish particular guidance with respect to distinguishing law from fact." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982)). And federal Rule 52 "applies to findings of fact, including those described as 'ultimate facts' because they may determine the outcome of the litigation." *Id.*

[37] *See, e.g., Lindbo v. Colaska, Inc.*, 414 P.3d 646, 651 (Alaska 2018) (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204

(continued...)

-14-                                                                    7407

clear error but review de novo the application of those facts to the relevant articulated law.[38] But these statements do nothing more than state the obvious when there is an easily determinable difference between the underlying factual findings and the ultimate legal determination. For example, if there is significantly defined law, a party might assert on appeal that the superior court: (1) made erroneous underlying factual findings; (2) applied the wrong law or wrongly characterized the correct law; or (3) wrongly applied the correct law to the underlying factual findings. The first alleged error seems one of fact, reviewed for clear error, while the latter two alleged errors seem legal, reviewed de novo. This is not out of the ordinary from typical appellate review of factual and legal determinations.[39]

---

**37** (...continued)
P.3d 1013, 1018 (Alaska 2009)); *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1274 (Alaska 2014)); *Brown v. Knowles*, 307 P.3d 915, 923 (Alaska 2013) (quoting *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009)).

**38** *See, e.g., In re Hospitalization of Naomi B.,* 435 P.3d 918, 923-24 (Alaska 2019) (quoting *Jacob S.*, 384 P.3d at 763-64); *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013) (quoting *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1143 (Alaska 2001)); *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003).

**39** *See generally* HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW: REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 7-9 (3d ed. 2018) (discussing fact/law paradigm and its limitations).

As the United States Supreme Court has recognized, "[m]ixed questions are not all alike."[40] A truly mixed question of fact and law appears when controlling law is not so definitely defined, but rather involves abstract legal concepts "more akin to a general guide for the exercise of considered judgment," so that the determination "generally def[ies] ready categorization as either law or fact."[41] "[T]hese rules generally acquire meaning, over time, through judicial application to the circumstances of particular cases" and "may gain meaning through repeated judicial interpretation."[42] In this context the Supreme Court applies a functional analysis, focusing primarily on which court is in the best position to decide the issue.[43] The Supreme Court has said:

> A finding of fact in some cases is inseparable from the principles through which it was deduced. At some point, the reasoning by which a fact is "found" crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment. Where the line is drawn varies according to the nature of the substantive law at issue. Regarding certain largely factual questions in some areas of the law, the stakes — in terms of impact on future

---

[40]    *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

[41]    EDWARDS & ELLIOTT, *supra* note 39, at 8.

[42]    *Id*.

[43]    *Id*. at 14 (citing *Miller v. Fenton*, 474 U.S. 104, 114 (1985)); *see also Meyer v. State*, 368 P.3d 613, 619-20 (Alaska App. 2016) (considering "what the real-world consequences would be if . . . appellate courts adopted a 'clearly erroneous' standard of review versus a 'de novo' standard of review").

cases and future conduct — are too great to entrust them finally to the judgment of the trier of fact.[44]

As noted above, some constitutional questions involve "stakes [that] . . . are too great" for deferential review, thereby requiring more than the judgment of a single judge.[45] In these contexts the Supreme Court has stated that it "is not bound by the conclusions of lower courts, but will reexamine the evidentiary basis on which those conclusions are founded."[46]

For example, both we and the Supreme Court examine de novo the mixed questions of law and fact presented by certain criminal probable cause and reasonable suspicion determinations.[47] The "principal components" of these determinations are "the events which occurred leading up to the stop or search, and then the decision whether these historical facts . . . amount to reasonable suspicion or to probable cause."[48] The second part of this analysis — whether the facts amount to reasonable suspicion or to

---

**44**     *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 n.17 (1984) (applying independent review to determine existence of actual malice in First Amendment defamation action); *see* EDWARDS & ELLIOTT, *supra* note 39, at 8 (noting de novo review is needed "when the interests at issue are deemed too important to trust to the judgment of a single district judge constrained by 'the logistical burdens' of the trial process, . . . but rather are thought better addressed through the 'reflective dialogue' and 'collective judgment' characteristic of appellate courts" (quoting *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231-32 (1991))).

**45**     *Bose Corp.*, 466 U.S. at 501 n.17.

**46**     *Id.* at 509-10 (quoting *Time, Inc. v. Pape*, 401 U.S. 279, 284 (1971)).

**47**     *Ornelas v. United States*, 517 U.S. 690, 697, 699 (1996); *State v. Joubert*, 20 P.3d 1115, 1119 (Alaska 2001).

**48**     *Ornelas*, 517 U.S. at 696.

probable cause — "is a mixed question of law and fact."[49] The Supreme Court has stated that independent appellate review is appropriate for this analysis because "the legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles."[50] The Supreme Court reasoned that "de novo review tends to unify precedent and will come closer to providing . . . a defined 'set of rules.' "[51]

For similar reasons, this exacting de novo review standard applies in the present context, particularly in light of our precedent regarding involuntary commitment and medication declaring "Alaska's constitutional guarantee of individual liberty to be more protective" than its federal counterpart.[52] We therefore clarify that we will review de novo the superior court's decisions and use our independent judgment to determine whether, based on underlying factual findings made by the superior court, there was clear and convincing evidence that involuntary ECT was in Lucy's best interests and was the

---

[49]     *Id.*

[50]     *Id.* at 697.

[51]     *Id.* We similarly stated in *Naomi B.* that we will review involuntary commitment cases despite their mootness because our opinions "will likely be useful as guidance by analogy to future commitment proceedings . . . . [D]eclining review of commitment appeals based on mootness effectively deprives trial courts of guidance on how to apply the statutory requirements to the facts of individual cases." 435 P.3d 918, 928-29 (Alaska 2019).

[52]     *See Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 245 (Alaska 2006).

least intrusive available treatment.[53]  But we will review the underlying factual findings involved in these inquiries for clear error.

### 2.    The superior court properly considered and made findings about the *Myers*-based best interests factors.

We held in *Myers* that superior courts "should consider" five statutorily derived factors to determine whether involuntary psychotropic medication is in the "best interests of a patient."[54]  We said that "[c]onsidering these factors will be crucial in establishing the patient's best interests."[55]  These mandatory factors are:

> (A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
>
> (C) a review of the patient's history, including medication history and previous side effects from medication;
>
> (D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and

---

[53]    *See id.* at 250 ("[T]hough the [best interests] answer must be fully informed by medical advice received with appropriate deference, in the final analysis the answer must take the form of a legal judgment that hinges not on medical expertise but on constitutional principles aimed at protecting individual choice.").

[54]    *Id.* at 252.

[55]    *Id.*

(E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment.[56]

Although in *Myers* we did not explicitly state that superior courts must make specific findings on each factor, we later noted in *In re Hospitalization of Gabriel C.* — albeit in passing — that such findings are required: "We take th[e] occasion to note that the superior court must expressly make or incorporate specific findings on each of these best interests factors in a case where involuntary medication is requested."[57] But despite referring to the *Myers* factors, in *Gabriel C.* we actually recited the favored, but not mandatory, "Minnesota factors."[58]

We recently clarified in *In re Hospitalization of Naomi B.* that our *Gabriel C.* opinion "misquoted *Myers* as making the Minnesota factors mandatory" but that it otherwise did "not alter the analytical framework established by *Myers* and

---

[56]    *Id.* (quoting AS 47.30.837(d)(2)).

[57]    324 P.3d 835, 840 (Alaska 2014).

[58]    *Id.* In addition to establishing the mandatory *Myers* factors, in *Myers* we favorably referred to five factors that are "sensible" in a court's best interests determination. These favored but not mandatory factors are:

(1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment;

(2) the risks of adverse side effects;

(3) the experimental nature of the treatment;

(4) its acceptance by the medical community of the state; and

(5) the extent of intrusion into the patient's body and the pain connected with the treatment.

*Myers*, 138 P.3d at 252 (citing *Price v. Sheppard*, 239 N.W.2d 905, 913 (Minn. 1976)).

*Bigley.*"[59] We explained that the helpful Minnesota factors provide " 'sensible' guidance in determining whether involuntary medication is in a patient's best interests, but they are not a mandatory component of the analysis."[60]

We now find it prudent to clarify and emphasize that superior courts must make specific findings on relevant, contested mandatory *Myers* factors before ordering involuntary medication or ECT.[61] Because consideration of the *Myers* factors ultimately may allow a court to deny a patient's fundamental right to refuse psychotropic medication or ECT,[62] we emphasize the importance of such findings to both patient due process and appellate judicial review.

In this case, Lucy specifically challenges the superior court's findings as they relate to what really are the Minnesota factors. But, as noted above, the court's considerations and findings under the *Myers* factors are dispositive. And on the facts of this case, the court's considerations and findings relevant to what would be contested Minnesota factors are encompassed within its findings relevant to contested *Myers* factors. We therefore review only the court's consideration of Lucy's best interests under the relevant, contested *Myers* factors. We note that appellate review generally would benefit from a superior court specifically matching its best interests findings to each respective *Myers* factor. But in this case the superior court's oral ruling adequately reflects its various findings related to each *Myers* factor.

___

[59]     435 P.3d 918, 935 (Alaska 2019).

[60]     *Id.* (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180-81 (Alaska 2009)).

[61]     *See* Alaska R. Civ. P. 52(a) ("In all actions tried upon the facts without a jury . . ., the court shall find the facts specially and state separately its conclusions of law . . . .").

[62]     *Myers*, 138 P.3d at 251-52.

### a. Factor 1: explanation of the patient's diagnosis and prognosis

The first *Myers* best interests factor requires the superior court to consider "the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication."[63] The superior court explained that Lucy suffered from catatonia and that she was "entirely unable to care for her basic needs." The court also considered both psychiatrists' testimony and found that ECT would improve Lucy's condition because it has a "80 to 90 percent response rate." The court also found expeditious ECT necessary because Lucy could be lost: "I believe based on the facts that we have here . . . her body is shutting down essentially that we may lose this young soul in the process because of our failure to act."

Lucy argues the court's finding that she would die without ECT was clearly erroneous. She contends testimony demonstrated that she would die without intravenous fluids and nutritional supplements, not that she would die without ECT. But as the State argues, the court's statement that "we may lose this young soul" without ECT appears to refer to losing Lucy to a permanent catatonic state, not death. The court earlier referred to the psychiatrists' testimony and found that "what I'm hearing from the doctors is the fact that . . . if something isn't done to deal with her situation and to alert her to what's going on, we may lose her as an individual." The record supports this; the Juneau psychiatrist testified that if untreated, Lucy's catatonia could be irreversible: "The longer that you let catatonia go on, the harder it becomes to treat, and it becomes more of a pervasive illness. And my fear for her is that she will essentially become stuck, and we won't be able to reverse this." The Juneau psychiatrist further testified that with ECT there was an 80% to 90% chance Lucy would improve, but that without ECT

---

[63] *Id.* at 252.

her prognosis was "[e]xtremely poor," requiring a feeding tube and resulting in pressure sores, pneumonia, or blood clots that could lead to further complications. The court's factual finding that Lucy could be lost without treatment is thus supported by the record.

### b. Factor 2: information about the proposed treatment

Second, the superior court must look to "information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions."[64] The court incorporated into its findings the testimony about how ECT would be applied to Lucy, explaining that ECT was necessary to counteract her catatonia, that it would be administered in Fairbanks by a psychiatrist who had studied the procedure with out-of-state specialists, that it would be administered for only 30 days before requiring a renewed hearing, and that side effects could include muscular pain, clenched jaw, and dental and cardiac issues. These findings are fully supported by the testimonial record.

Lucy faults the superior court's findings for failing to consider "how many times Lucy would need to be subjected to ECT to experience improvement in her symptoms, or how long that improvement was likely to last." She argues that the court failed to consider that if she regained capacity during or following the court-ordered treatment, she might not consent to continuing ECT, and the long-term effects of the treatment would not be realized.

These arguments are unpersuasive. The court did consider the duration of Lucy's ECT by ordering ECT for 30 days and that "whether it's extended or not . . . limits the amount of time in which the sessions can occur." Testimony was that patients typically undergo two to three treatments a week, and that after three weeks of treatment

---

[64] *Id.*

Lucy likely would experience "benefits that are sustained more than 24 hours." This is correct under the statutory scheme upon which *Myers* is premised: The court could not order medication beyond the commitment period without reviewing a renewed request for such treatment.[65]

And, as the State argues, whether Lucy would consent to further ECT if she regained capacity is speculative. Lucy's conceded "history of noncompliance with treatment recommendations following release" does not invalidate or contradict the superior court's findings because any long-term treatment plan for her catatonia, not just ECT, would require continued compliance with a treatment plan following release, as evidenced by Lucy's prior treatment plans requiring continued psychotropic medication prescriptions.

Lucy also argues that the court failed to consider potential memory and cognitive impairment resulting from ECT. Although testimony noted claims of short-term memory loss directly following the procedure, both physicians stated that memory typically improves following ECT. Lucy additionally argues that the court erroneously found "no evidence of death" as a potential ECT side effect. Testimony indicated that ECT's potential side effects included an "approximately one in 10,000" chance of death, as well as nausea, physical injuries (such as electrode burns or fractures from inadequate sedation), and any side effects of the general anesthesia required before an ECT patient undergoes the procedure. Anesthesia's risks include stroke, heart attack, and pulmonary embolism. The court said there was "no evidence of death" after expressly considering both ECT and anesthesia's potential side effects and weighing the pros and cons of ordering ECT. The court said it gave "major deference" to the psychiatrists' testimony,

---

[65]     *See* AS 47.30.839(h) (requiring facility wishing to continue involuntary medication administration after commitment period ends to "file a request to continue the medication when it files the petition to continue the patient's commitment").

and clearly assessed the "one in 10,000" chance of death as negligible enough to find "no evidence of death." And even if the court erred by failing to make more specific findings on memory loss and evidence of the "one in 10,000" chance of death, any error is harmless in light of the court's overall finding about side effects: "[T]he negatives are far, far, far less than the positives."

### c.      Factor 3:  review of the patient's history

Third, the superior court must "review . . . the patient's history, including medication history and previous side effects from medication."[66]  The court found that Lucy previously had been given psychotropic medications but that each time "she's back in [the] hospital again and again."  Her previous treatment methods "ha[d]n't worked sufficiently."

Lucy argues that the superior court "disregarded [her] prior history of recovery and the likelihood that she would regain competency" and "disregarded Lucy's history of treatment noncompliance and the possibility that she had been prematurely dismissed."  But these arguments are unavailing.  The court considered Lucy's prior history and treatment noncompliance, incorporating the doctors' testimony into its findings and stating that "their concern is so heightened based on historical data and based on this patient."  The court stated, "I'm concerned that as each treatment module ends, another begins, and the time between each is shorter and shorter . . . . [T]here's nothing else available out there that has worked."  The court also considered the likelihood that Lucy would regain capacity, finding it "unlikely she [would] achieve improvement with only the administration of [psychotropic medication]." The court thus appropriately considered and made sufficient findings on Lucy's history, all supported by the record.

---

[66]      *Myers*, 138 P.3d at 252.

#### d. Factor 4: interaction with other medications

Fourth, the superior court must consider "interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol."[67] The court found necessary administering both ECT and psychotropic medications to Lucy. Lucy does not contest the court's order for psychotropic medication or raise concerns about the medication's combination with ECT.

#### e. Factor 5: information about alternative treatments

Finally, the superior court must consider and make findings on "information about alternative treatments and their risks, side effects, and benefits, including the risk of nontreatment."[68] The court discussed potential alternatives, stating, "I thought about perhaps delaying my decision . . . I don't think that's going to be the way to go in this case." The court also discussed using only medication to treat Lucy, stating that "the alternatives that have been suggested as continuation of . . . drugs have not been proven to be successful in the past, and I doubt they'll be proven successful in the future." In conformance with this factor, the court discussed Lucy's prior commitments and treatments, found that she was not responding to the psychotropic medications she was being given, and found that expeditiously administered ECT was her only real option. The court thus appropriately considered and made findings about alternative treatments.

#### f. Conclusion regarding best interests

Lucy argues that the superior court's ultimate determination that ECT's "negatives are far, far, far less than the positives" fails to properly weigh the *Myers*

---

[67] *Id.*

[68] *Id.*

factors. But *Myers* "does not dictate the weight the court gives" each factor.[69] Reviewing the underlying findings regarding Lucy's best interests, we hold that the court considered all relevant, contested *Myers* best interests factors and that its factual findings were not clearly erroneous. Taking those factual findings as true, we agree with the court that ordering involuntary ECT was — by clear and convincing evidence — in Lucy's best interests.

### 3. The superior court properly considered and found that involuntary ECT was Lucy's least intrusive treatment option.

We next consider whether involuntary ECT was Lucy's least intrusive treatment option. In *Bigley* we clarified that any proposed alternative "must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."[70] Lucy argues that other, less intrusive alternatives were available to her; for example, the superior court could have extended her commitment or authorized a different psychotropic medication. Lucy argues that the superior court failed to consider treatment only with psychotropic medication before ordering involuntary ECT. She states that the court should have waited another month to see if psychotropic medication would work before considering ECT. She contends that because she had regained capacity within a month during prior commitments, from either medication or spontaneously, "the court should have considered what the probability was that Lucy might regain competency during her 30-day commitment or some time after so that she could be asked whether she wanted to submit to ECT."

But the superior court considered these options and explained their rejection. The court considered whether to permit Lucy to remain on medication and

---

[69] *Kiva O. v. State, Dep't of Health & Soc. Servs. Office of Children's Servs.*, 408 P.3d 1181, 1190 (Alaska 2018).

[70] 208 P.3d 168, 185 (Alaska 2009).

make the ECT determination at a later date: "I guess what the court can do is delay this process for a period of time to see if [medications will] work. But my concern is that each day we wait, each day [Lucy] may be get[ting] worse and that's what I hear from this doctor. And the time span is collapsing."

The court's finding that Lucy's condition was unaffected by psychotropic medication is supported by the record and not clearly erroneous. The Juneau psychiatrist testified that the medication administered to Lucy during each prior catatonia commitment was increasingly less effective, and that, in the week of her present commitment, there had been no significant change in her condition, despite an increasing dosage. The Juneau psychiatrist concluded that due to Lucy's historic and current lack of response to the medication any significant improvement was "highly unlikely." The Fairbanks psychiatrist agreed that psychotropic medication alone would not be sufficient to improve Lucy's catatonic state.

The court's finding that Lucy's condition was quickly deteriorating and required immediate action also is supported by the record and not clearly erroneous. This was Lucy's third catatonic episode in six months; the longer this persisted, the more likely it was that she would remain in a permanent catatonic state.

The superior court did not clearly err in its underlying findings regarding whether involuntary ECT was Lucy's least intrusive treatment option. Taking those factual findings as true, we agree with the court that — by clear and convincing evidence — involuntary ECT was Lucy's least intrusive treatment option because alternatives would not "actually satisfy the compelling state interests that justify the proposed state action."[71]

---

[71] *Id.*

### 4. Summary and conclusion

The superior court considered and did not clearly err in its findings about all relevant, contested *Myers*-based best interests factors, and we agree that ordering involuntary ECT was in Lucy's best interests based on those factual findings. And the superior court considered and did not clearly err in its findings about potentially lesser intrusive alternative treatment options; because psychotropic medication alone would not "actually satisfy the compelling state interests that justify the proposed state action,"[72] we hold, as a matter of law, that the superior court did not err in its overall least intrusive alternative determination. Because ordering involuntary ECT was both in Lucy's best interests and the least intrusive treatment option available, we hold that it was the least restrictive means to advance the state's compelling interest in protecting Lucy.

## IV. CONCLUSION

We AFFIRM the superior court's involuntary ECT order.

---

[72] *Id.*