NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of )<br><br>KEEGAN N. ) | Supreme Court No. S-17443<br><br>Superior Court No. 3AN-19-00364 PR<br><br>MEMORANDUM OPINION AND JUDGMENT[*]<br><br>No. 1786 – September 2, 2020 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Keegan N. Katherine Demarest, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

A man was transferred to the Alaska Psychiatric Institute (API) for the purpose of restoring his competency for trial in several pending criminal cases. A treating psychiatrist soon petitioned for a 30-day civil commitment order and authorization to administer psychotropic medication. After hearing testimony from

---

[*]    Entered under Alaska Appellate Rule 214.

another psychiatrist and a court-appointed visitor, a magistrate judge found by clear and convincing evidence that the man was likely to cause harm to himself or others due to mental illness if he was not committed and that commitment was the least restrictive alternative. The magistrate judge also found that the man was incapable of giving informed consent to the administration of psychotropic medication and that involuntary medication was in his best interests. The superior court reviewed the record and agreed with the magistrate judge's findings and conclusions. The man appeals, arguing that evidence of his threatening conduct was not recent enough to justify a finding that he was likely to harm himself or others and that the court should not have allowed the treating psychiatrist to choose between two paths of psychotropic medication.

We conclude that the magistrate judge's findings of fact were not clearly erroneous and that the superior court did not err in adopting them. We also conclude that the court did not err in deciding that involuntary commitment and the proposed treatment plan were the least restrictive alternatives. We therefore affirm the commitment and medication orders.

## II.    FACTS AND PROCEEDINGS

In early February 2019 28-year-old Keegan N.[1] was committed to API for purposes of attempting to restore his competency for trial in three pending criminal cases.[2] Two weeks later API psychiatrist Dr. Deborah Guris filed two petitions: one sought civil commitment for 30 days and the other sought court approval for the administration of psychotropic medication. The commitment petition alleged that Keegan had threatened and assaulted staff members and a fellow patient and that he could remain at API only if permission to administer "crisis medication [was]

---

[1]     We use a pseudonym to protect the party's privacy.

[2]     *See* AS 12.47.110.

immediately granted." In the medication petition Dr. Guris listed four medications that should be administered "in the respondent's best interest" — Haldol, olanzapine, Ativan, and diphenhydramine — with the caveat that olanzapine would be used if Keegan "[did] not respond to Haldol or experience[d] adverse side effects."

## A. The Hearing On Commitment

A bifurcated hearing was held before a magistrate judge three weeks later to address both the commitment petition and the medication petition. Dr. Andrew Pauli, an API psychiatrist, testified that Keegan had been diagnosed with schizophrenia and was "floridly delusional," "quite paranoid," and "very unpredictable and labile." He testified that Keegan had "posed a risk of harm to others" since he was first admitted. He said that Keegan had been "assaultive towards patients" and described how once, while he and Keegan were in the midst of a friendly conversation, Keegan "just flipped" and feinted toward him in a threatening way. Dr. Pauli testified that there had been several other incidents in the past month "where [Keegan] was threatening or attacking" others and that API began "one-to-one staffing" with Keegan to ward off further confrontations. It was Dr. Pauli's opinion that Keegan likely would have committed more assaults without these extra staffing precautions. The doctor concluded that there were no feasible alternatives for Keegan that were less restrictive than hospitalization and medication.

The magistrate judge granted the commitment petition. In his findings at the close of the evidence, the magistrate judge observed that although Keegan had not actually hit anyone since the petition was filed three weeks earlier, another incident "would have happened very likely, or could have happened" had API not taken the extra measures to prevent them and that there had been "a number of incidents" that would have become violent had they "gone just a little bit further." The court concluded,

therefore, that Keegan's recent behavior met the "likely to cause harm" standard for commitment.[3]

## B.    The Hearing On Medication

The magistrate judge then turned to the issue of involuntary medication. The court-appointed visitor[4] testified first; it was her opinion that Keegan did "not demonstrate a rational thought process" and "was not able to articulate reasonable objections [to] taking medication."  She concluded that Keegan did "not have the capacity to give informed consent."

Dr. Pauli testified next.  He identified the medications listed in the medication petition filed by Dr. Guris and described their uses.  He testified that Haldol and olanzapine are antipsychotics, which could "bring . . . down" hallucinations or delusions "as well as . . . improve [the patient's] ability to relate and think coherently"; Ativan is a tranquilizer used to reduce anxiety and paranoia; and diphenhydramine is "an even milder" tranquilizer used to treat symptoms that "sometimes can come along . . . as a side effect of" the other medications.  He identified the likely dosages of each drug if used in Keegan's case.  He also testified about their side effects.  The "most concerning" was tardive dyskinesia, "a potentially irreversible involuntary movement of the mouth, tongue, [and] cheeks"; Haldol had the highest risk of this effect.

Dr. Pauli testified that he had been offering Keegan Abilify, which was not listed in the medication petition but is "a peer of olanzapine." He testified, however, that

---

[3]    *See* AS 47.30.735(c) (authorizing 30-day commitment if court "finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled").

[4]    *See* AS 47.30.839(d); *In re Hospitalization of Lucy G.*, 448 P.3d 868, 872 n.7 (Alaska 2019) (explaining court-appointed visitor's role in proceeding on petition to authorize psychotropic medication).

the different medications Dr. Guris listed in the petition "would work." He said that Dr. Guris probably included both Haldol and olanzapine because "[i]f one doesn't work or is causing some side effects, it's nice to have something with a . . . different profile." He said that he would probably start with the olanzapine and use the Ativan if necessary to address Keegan's suspicion and paranoia. He testified that the benefits of the medications outweighed their risks and that Keegan lacked the ability to give or withhold informed consent.

At the close of the hearing the magistrate judge found by clear and convincing evidence that Keegan was "not competent to provide informed consent," that medication was in his best interests, and that there was "no less intrusive alternative [to involuntary medication] available." He granted the medication petition, authorizing API to administer all four listed medications, and submitted his findings and recommendations on both petitions to the superior court. Because Keegan objected to some of the findings, the superior court reviewed them de novo.[5] The superior court agreed with the magistrate judge's recommendations and signed orders for commitment and the administration of psychotropic medication.

Keegan appeals.

## III. STANDARD OF REVIEW

"We review the superior court's factual findings in involuntary commitment or medication proceedings for clear error and reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[6] "Whether those findings

---

[5] *See* Alaska R. Civ. P. 53(d)(2)(B) (requiring court to "consider under a de novo standard of review all objections to findings of fact made or recommended in the [magistrate judge's] report").

[6] *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019) (continued...)

meet the involuntary commitment and medication statutory requirements is a question of law we review de novo."[7] We "review de novo the superior court's decisions and use our independent judgment to determine whether, based on the underlying factual findings made by the superior court, there was clear and convincing evidence" that involuntary commitment or medication was in the respondent's best interests and "was the least intrusive available treatment."[8]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Clearly Err In Finding That Keegan Was Likely To Cause Harm To Others As A Result Of Mental Illness.

The court may "commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm" to himself or others.[9] Keegan challenges the superior court's "likely to cause harm" finding, arguing that the conduct on which it was based was not recent enough to justify his commitment because the State failed to identify any specific threats or assaults in the "three weeks between the filing of the petition and the hearing." As support he cites *In re Hospitalization of Tracy C.*, in which we held that a court "may not involuntarily commit a patient based only on the patient's

---

[6]      (...continued)
(quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[7]      *In re Jacob S.*, 384 P.3d at 764.

[8]      *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262 (Alaska 2019) (internal quotation mark omitted) (quoting *In re Lucy G.*, 448 P.3d at 878).

[9]      AS 47.30.735(c).

symptoms at the time of admission to a treatment facility if by the time of the hearing the patient is no longer . . . likely to harm [him]self or others."[10]

Because the commitment statute does not define "likely to cause harm," we look to the statutory definition of "likely to cause serious harm" for interpretive help.[11] A respondent is likely to cause serious harm if he or she poses a "substantial risk of harm to others as manifested by *recent behavior* causing, attempting, or threatening harm, *and* is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."[12]

The magistrate judge found that although Keegan had not assaulted anyone recently, he likely would have if API had "not taken steps to intervene and restrain or calm [him] down." He found that there were "a number of incidents" that could have ended in "physical violence" had they been allowed to go "just a little bit further." This situation is analogous to that in *In re Hospitalization of G.L.*, in which the respondent was "not violent on the day of the hearing" but the evidence showed this was because he was taking his medication; the evidence also showed that on discharge the respondent would likely discontinue his medication, decompensate rapidly, and become violent.[13] We held that this evidence supported the finding that the respondent was "likely to cause harm" if not involuntarily committed.[14]

---

[10]     249 P.3d 1085, 1092 (Alaska 2011).

[11]     *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1110 (Alaska 2009).

[12]     AS 47.30.915(12)(B) (emphasis added).

[13]     449 P.3d 694, 699-700 (Alaska 2019).

[14]     *Id.*

In this case, Dr. Pauli's testimony about Keegan's past assaultive and threatening conduct may have lacked the detail necessary to determine just how recent it was (though it had necessarily occurred in the five weeks since Keegan's admission). In any event, a finding of "likely to cause harm" is supported by Dr. Pauli's further testimony that Keegan regularly threatened physical harm to other patients and API staff — averted only by extra safety precautions — and that if released he would likely stop "taking his meds," "deteriorate," "cause a fight," and "end up back in jail." The finding that Keegan was mentally ill and was "likely to cause harm" to himself or others was not clearly erroneous.

**B.    The Superior Court Did Not Err In Determining That The Administration Of Psychotropic Medication Was In Keegan's Best Interests And The Least Intrusive Option.**

Once the State proves that a person lacks the capacity to consent to the administration of psychotropic medication, the State must still demonstrate by clear and convincing evidence that administering the medication over the person's objection "is in the best interests of the patient and that no less intrusive alternative treatment is available."[15]   The five factors to be considered in a best interests determination are known as the *Myers* factors:[16]

> (A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of

---

[15]    *In re Hospitalization of Naomi B.*, 435 P.3d 918, 934 (Alaska 2019) (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180 (Alaska 2009)).

[16]    *Id.* at 934-35 (citing *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 252 (Alaska 2006)) (directing courts to apply AS 47.30.837(d)(2)'s informed consent factors to best interests determination).

dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;

(C) a review of the patient's history, including medication history and previous side effects from medication;

(D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and

(E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment.[17]

We recently found it "prudent to clarify and emphasize that superior courts must make specific findings on relevant, contested mandatory *Myers* factors before ordering involuntary medication" because of "the importance of such findings to both patient due process and appellate judicial review."[18]

Keegan's first challenge to the medication order implicates the fifth *Myers* factor — "information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment."[19] Keegan argues that because Dr. Pauli testified that he had been offering Keegan Abilify, which is "similar to olanzapine and Haldol," the court should have considered it as an alternative to the two psychotropic drugs identified in the petition. Keegan argues that because the court failed to consider Abilify, the State failed to prove that it was not a less intrusive alternative.

But Dr. Pauli testified that Abilify would be an option only "if [Keegan] was willing to take it, [because] there's not an injectable," and Keegan was "mostly refusing" to take it. The only psychotropic medications on the table for involuntary

---

[17]     *Myers*, 138 P.3d at 252 (quoting AS 47.30.837(d)(2)).

[18]     *In re Hospitalization of Lucy G.*, 448 P.3d 868, 879 (Alaska 2019).

[19]     *Myers*, 138 P.3d at 252 (quoting AS 47.30.837(d)(2)).

administration were Haldol and olanzapine; the context of Dr. Pauli's mention of Abilify shows that the superior court did not have to consider it as a viable alternative treatment.

Keegan also argues that the superior court erred by failing to require that the treatment begin with one or the other of the two proposed treatment plans: either (1) Dr. Guris's recommendation of Haldol and then olanzapine, if needed, or (2) Dr. Pauli's preference for starting with olanzapine. Keegan notes that the court's "written order put no constraints on the doctors' administration of the two drugs," meaning that theoretically both Haldol and olanzapine could be administered simultaneously. Keegan cites Dr. Pauli's hearing testimony that both drugs are sometimes *prescribed* at the same time, with one as a "PRN" for use as a backup as necessary; the doctor did not testify that both would be *administered* at the same time.[20] The doctor's testimony, though not perfectly clear, seemed to indicate that the two drugs could show different effects and therefore be options depending on how the patient was reacting in the moment. Keegan's counsel acknowledged in her closing argument that giving "both olanzapine and Haldol at the same time" was "not going to be an approach taken by the hospital"; and the magistrate judge, in his oral findings, summarized Dr. Pauli's testimony as "not saying I'm going to give [Keegan] everything all at once." In short, while the written order could have been more specific, the hearing transcript supports the conclusion that Haldol and olanzapine were ordered as alternative, not simultaneous, treatments.

Keegan cites our recent case *Kiva O. v. State, Department of Health & Social Services, Office of Children's Services* for the proposition that judicial deference to the doctors for deciding the order of medications constitutes a failure to make "a legal

---

[20] In medical shorthand, "p.r.n.," from the Latin "*pro re nata*," means "when necessary." *See D.P. v. Wrangell Gen. Hosp.*, 5 P.3d 225, 226 n.1 (Alaska 2000); *Pro Re Nata*, BLACK'S LAW DICTIONARY (11th ed. 2019).

judgment that hinges *not on medical expertise* but on constitutional principles aimed at protecting individual choice."[21] Keegan argues that whenever there are two medication options on the table, the court's constitutional obligation is to decide which of the two is the least intrusive alternative. He argues that the two psychotropic drugs proposed for use in this case were not interchangeable because they carried different risks.

In *Kiva O.* we reviewed a medication order that authorized the administration of Lexapro, an antidepressant, to a child in state custody, over the objections of his mother.[22] The order allowed the child's physician to "begin treatment with Lexapro at 5 mg, to increase to 10 mg and/or be accompanied [by] treatment [with] an atypical antipsychotic, as necessary."[23] "The decision whether to increase the dosage of Lexapro from five milligrams to ten would occur 'at one to two months' into the treatment regime."[24] If the dosage was increased and the child's symptoms persisted, the physician could consider other alternatives, including whether to add "a very small dose of an atypical antipsychotic [such as Risperdal] alongside Lexapro to act as a mood stabilizer."[25] The time for these further discretionary decisions was unstated in the order but, based on the physician's testimony, could have been as much as nine months to a year later.[26] We affirmed the superior court's authorization of Lexapro but decided that, "[g]iven the serious risks of Risperdal and the possibility of changed circumstances in

---

[21]     408 P.3d 1181, 1193 (Alaska 2018) (emphasis in original) (quoting *Myers*, 138 P.3d at 250).

[22]     *Id.* at 1184-85.

[23]     *Id.* at 1185.

[24]     *Id.* at 1192.

[25]     *Id.* (alteration in original).

[26]     *Id.*

the time frame at issue, . . . it was error to find that the open-ended authorization to administer [Risperdal] in the future was the least intrusive alternative."²⁷ We noted that in addition to the child's response to the medications, "the situation may have changed in the intervening months in [other] ways that make it unnecessary to authorize further medication over [the mother's] objection," including a change in the mother's receptivity to the doctors' recommendations.²⁸

This case is readily distinguishable. In *Kiva O.* the alternative medical decision — whether to add the antipsychotic Risperdal — was going to be made months in the future, during which time much could happen to affect its advisability. Given the importance of the constitutional rights at stake, and because "judicial decision-making [should] be fully informed about the patient's therapeutic progress, changes in the parent's perspective, and the development of any available less intrusive treatments," we held in *Kiva O.* that "[a]n order authorizing medication over a parent's objection should be judicially reviewed at least every 90 days."²⁹

Here, Keegan urged the court to order that if the doctor began with olanzapine or Haldol, decided it was "not . . . as effective as expected," and wanted to try the other one, the State should be required to reapply for authorization. But the magistrate judge was deciding the treatment that should begin immediately, at the outset of a 30-day commitment, and to last no longer than the commitment period.³⁰ The magistrate judge explicitly recognized that deciding whether Haldol or olanzapine was

---

²⁷    *Id.* at 1193-94.

²⁸    *Id.* at 1193.

²⁹    *Id.* at 1194.

³⁰    *See* AS 47.30.839(g) (providing that court approval of medication applies only to patient's initial commitment period if decision is made during that time).

the better option depended on some initial trial and error, and he concluded it should be "left . . . up to the professional judgment of the doctor to figure out which one to try first, which ones to try second." Importantly, there is not the same "possibility of changed circumstances in the time frame at issue" as in *Kiva O.*[31]

We recognize the court's duty in commitment and involuntary medication cases to safeguard respondents' fundamental constitutional rights to personal autonomy and choice.[32] But we note also our observation in *Kiva O.* that "courts have neither the time nor the expertise to micromanage medical treatment plans that are proposed by qualified medical experts."[33] The court in this case could reasonably decide that the administration of one or the other of the two psychotropic medications listed in the petition would be in the respondent's best interests in the immediate future but that the choice between them was not possible absent some initial experimentation and close observation. In this circumstance, the court could reasonably approve both Haldol and olanzapine as alternatives subject to the doctor's discretion as he considered the patient response. We conclude that the superior court did not err in deciding to leave that choice to the medical expert's judgment.

## V.    CONCLUSION

We AFFIRM the superior court's 30-day commitment order and its order approving the administration of psychotropic medication.

---

[31]    408 P.3d at 1193.

[32]    *See id*.

[33]    *Id.*